No. 26-1962; 26-1963

---

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

ROBERT NICHOLS AND CORA NICHOLS,
Appellants,

vs.

JAMES LAWRENCE PEARSON,
Appellee

---

On Appeal from the Bankruptcy Appellate
Panel of the Ninth Circuit,
BAP No. 25-1086
BAP No. 25-1087
(Consolidated Appeals)

---

## APPELLANTS' OPENING BRIEF

David R. Haberbush, Esq. (107190)
Vanessa M. Haberbush, Esq. (287044)
HABERBUSH, LLP
444 West Ocean Boulevard, Suite 1400
Long Beach, CA 90802
Telephone: (562) 435-3456
Facsimile: (562) 435-6335
Attorneys for Appellants Robert Nichols and Cora Nichols

**Table of Contents**

Page No.

BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION . . . . . . 2

III.    APPLICABLE STANDARD OF APPELLATE REVIEW . . . . . . . . . . . . 3

IV.    STATEMENT OF THE ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . 4

V.    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

VI.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VII.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      A.    The Statutory Framework for Determining Nondischargeability of the Student Loan is Undisputed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           1.    The Definition of "Qualified Education Loan" is Provided in 26 U.S.C. § 221(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           2.    The Definition of "Qualified Higher Education Expenses" is Set Forth in 26 U.S.C. § 221(d)(2). . . . . . . . . . . . . . . . . . . . . . . . 17
           3.    The Definition of "Eligible Educational Institution" is Specified in 26 U.S.C. § 221(d)(2) and Set Forth in 26 U.S.C. § 25A(f)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
           4.    The Definition of "Eligible Student" . . . . . . . . . . . . . . . . . . . 20
      B.    The Bankruptcy Court Correctly Determined that St. George's is an Eligible Educational Institution, and Whether St. George's is an "Eligible Educational Institution" is the Only Relevant Inquiry, Not Whether SGU/NU Program is an "Eligible Program." . . . . . . . . . . . 22
           1.    The Bankruptcy Court Correctly Determined that St. George's Was an Eligible Educational Institution. . . . . . . . . . . . . . . . . . 23
           2.    The Bankruptcy Court Incorrectly Determined that Debtor Attended a Different Institution Than St. George's for his Premedical School Education. . . . . . . . . . . . . . . . . . . . . . . . . 26

i

3.      Debtor Was an "Eligible Student." . . . . . . . . . . . . . . . . . . . . . 27

4.      Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.     The Entirety of the Student Loan, in the Amount of $331,500, is for Qualified Higher Education Expenses. . . . . . . . . . . . . . . . . . . . . . . . 29

D.     Public Policy Supports a Finding that the Entire Student Loan is Nondischargeable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

VIII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATION REQUIRED BY CIRCUIT RULE 28-2 . . . . . . . . . . . . . . . 48

ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

26 C.F.R. § 1.221-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Federal Rule of Bankruptcy Procedure 7001 . . . . . . . . . . . . . . . . . . . . . . . 69

Federal Rule of Appellate Procedure 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Federal Rule of Appellate Procedure 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

11 U.S.C. § 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

11 U.S.C. § 523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

20 U.S.C. § 1087ll . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

20 U.S.C. § 1088 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

20 U.S.C. § 1091 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

26 U.S.C. § 25A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

26 U.S.C. § 221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

26 U.S.C. § 267 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

26 U.S.C. § 707 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

28 U.S.C. § 157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

28 U.S.C. § 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

28 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

## Table of Authorities

**Cases**                                                               **Page No.**

*Aspen Skiing Co. v. Cherrett* (*In re Cherrett*), 873 F.3d 1060 (9th Cir. 2017). . . . . 3

*Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395
(2d Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 45

*Conti v. Arrowood Indem. Co.*, 612 B.R. 877 (E.D. Mich. 2020).. . . . . . . . . . . . 35

*Decker v. Tramiel* (*In re JTS Corp.*), 617 F.3d 1102 (9th Cir. 2010). . . . . . . . . . . 3

*George Washington Univ. v. Pelzman* (*In re Pelzman*), 233 B.R. 575
(Bankr. D.D.C. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gorosh v. Posner* (*In re Posner*), 434 B.R. 800 (Bankr. E.D. Mich. 2010). . . . . . 14

*In re Conti*, 982 F.3d 445 (6th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . 33-37

*In re Decena*, 549 B.R. 11 (Bankr. E.D.N.Y. 2016). . . . . . . . . . . . . . . . 19, 23, 25

*In re Homaidan*, 646 B.R. 550 (Bankr. E.D.N.Y. 2022).. . . . . . . . . . . . . 33, 34, 36

*In re Jean-Baptiste*, 584 B.R. 574 (Bankr. E.D.N.Y. 2018). . . . . . . . . . . . . . . . 35

*In re Maas*, 497 B.R. 863 (Bankr. W.D. Mich. 2013).. . . . . . . . . . . . . . . . . . . 34

*In re Mallett,* 625 B.R. 553 (Bankr. M.D. Fla. 2021). . . . . . . . . . . . . . . . . . . . 37

*In re Mazloom*, 648 B.R. 1 (Bankr. N.D.N.Y. 2023). . . . . . . . . . . . . . . . . . 33, 38

*In re Monyak*, No. 19-17712, 2021 WL 371753 (Bankr. N.D. Ohio Feb. 2,
2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Murphy*, 282 F.3d 868 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 34, 37

*In re Quintanilla*, No. 8:17-AP-00800-RCT, 2020 WL 7333590 (Bankr. M.D. Fla.
Nov. 20, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 33-35, 40

*In re Rogers*, 374 B.R. 510 (Bankr. E.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . 30

*In re Rumer*, 469 B.R. 553 (Bankr. M.D. Pa. 2012). . . . . . . . . . . . . . 20, 21, 23, 25

*In re Sokolik*, 635 F.3d 261 (7th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . 37, 42

*In re Teran*, 638 B.R. 620 (Bankr. N.D. Cal. 2022). . . . . . . . . . . . . . . . . . . . . 14

*Lapusan v. Educ. Credit Mgmt. Corp.* (*In re Lapusan*), 244 B.R. 423
(Bankr. S.D. Ill. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Livingstone v. Walden Univ., LLC*, No. CV 22-3096-BAH, 2023 WL 8806616 (D.
Md. Dec. 20, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

iii

*Mendez v. Salven* (*In re Mendez*), 367 B.R. 109 (9th Cir. B.A.P. 2007). . . . . . . . . 4

*Motor Vehicle Cas. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 677 F.3d 869 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Roth v. Educational Credit Mgmt. Corp.* (*In re Roth*), 490 B.R. 908 (9th Cir. B.A.P. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Sahagun v. Landmark Fence Co.* (*In re Landmark Fence Co.*), 801 F.3d 1099 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Santa Fe Med. Servs., Inc. v. Segal* (*In re Segal*), 57 F.3d 342 (3d Cir. 1995). . . . 14

*Smith v. Rojas* (*In re Smith*), 435 B.R. 637 (9th Cir. B.A.P. 2010). . . . . . . . . . . . 4

*Soderlund v. Cohen* (*In re Soderlund*), 236 B.R. 271 (9th Cir. B.A.P. 1999). . . . . 4

*SS Farms, LLC v. Sharp* (*In re SK Foods, L.P.*), 676 F.3d 798 (9th Cir. 2012). . . . 3

*United Student Aid Funds v. Flint* (*In re Flint*), 238 B.R. 676 (E.D. Mich. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Zolg v. Kelly* (*In re Kelly*), 841 F.2d 908 (9th Cir. 1988). . . . . . . . . . . . . . . . . . 3

## Rules and Regulations

26 C.F.R. § 1.221-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

Federal Rule of Appellate Procedure 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Rule of Appellate Procedure 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Rule of Bankruptcy Procedure 7001. . . . . . . . . . . . . . . . . . . . . . . . . 9

## Statutes

11 U.S.C. § 109. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11 U.S.C. § 523. . . . . . . . . . . . 1, 9-11, 13-16, 22, 23, 25, 28, 29, 33, 35, 36, 43-45

20 U.S.C. § 1087ll. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 30

20 U.S.C. § 1088. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 21

20 U.S.C. § 1091. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22, 27, 28

26 U.S.C. § 25A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19, 23, 25, 27, 28

26 U.S.C. § 221. . . . . . . . . . . . . . . . . . 1, 8, 11, 15-22, 25, 26, 29-32, 35, 39, 40, 42

26 U.S.C. § 267. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 U.S.C. § 707. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 157. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

28 U.S.C. § 158. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1334. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**BRIEF**

## I.    INTRODUCTION

The Bankruptcy Appellate Panel (the "BAP") incorrectly determined that the loan Cora Nichols and Robert Nichols, plaintiffs in the underlying adversary proceeding and appellants in this Appeal ("Creditors"), made to James Lawrence Pearson, defendant in the underlying adversary proceeding, debtor in the underlying bankruptcy proceeding, and appellee in this Appeal ("Debtor"), is dischargeable under 11 U.S.C. § 523(a)(8)(B).[1] The dispute in this case concerns whether the loan at issue qualifies as a "qualified education loan" under the statutory framework of 26 U.S.C. § 221(d)(1) and, if so, the amount of the qualified education loan. Because Creditors assert that the entirety of the loan, in the amount of $331,500, is a qualified education loan, Creditors request that this Court reverse the entirety of the BAP decision, and affirm the decision of the bankruptcy court in part and reverse in part and find that the entirety of the loan in the amount of $331,500 is nondischargeable.

///

///

---

[1]     An addendum containing pertinent constitutional provisions, treaties, statutes, ordinances, regulations and rules is included herewith as indicated by the Table of Contents and bound with this Brief.

1

## II.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal[2] pursuant to 28 U.S.C. § 158(d) because Creditors appeal a final judgment, entered on February 27, 2026 (the "Judgment on Appeal"), of a bankruptcy appellate panel exercising jurisdiction pursuant to 28 U.S.C. § 158(b) to hear an appeal of the judgment issued by a bankruptcy judge entered on April 16, 2025 (the "Bankruptcy Court Judgment") pursuant to 28 U.S.C. § 157.  This Appeal is timely in that Creditors' Notice of Appeal was filed on March 13, 2026,[3] within thirty days after the entry of the Judgment on Appeal entered on February 27, 2026,[4] as required by Federal Rules of Appellate Procedure 4 and 6.

Both the Appeals are being briefed in connection with the same case, styled Ninth Circuit Court of Appeals Case Number 26-1962.

The proceeding below was a core proceeding pursuant to 28 U.S.C. §§

---

[2]    This Appeal consists of two consolidated appeals, styled case numbers 26-1962 and 26-1963, involving the same parties and same underlying bankruptcy case (which also involved consolidated appeals before the BAP). On April 20, 2026, this Court entered an order consolidating the appeals. While the cases were consolidated by the BAP, there were two judgments, both of which were appealed and consist of this consolidated appeal.

[3]    For both of now-consolidated appeals, Judgments were filed on the same day.

[4]    For both of now-consolidated appeals, Notices of Appeal were filed on the same day.

157(b)(2)(A) and (I). Therefore, the bankruptcy court below had subject matter jurisdiction to hear the matter pursuant to 28 U.S.C. §§ 157 and 1334 because the proceeding arose under Title 11 of the United States Code.

The Bankruptcy Court's Judgment and the Judgment on Appeal are final judgments because they terminated the litigation below and there was a complete adjudication of the litigation. *Aspen Skiing Co. v. Cherrett* (*In re Cherrett*), 873 F.3d 1060, 1064-65 (9th Cir. 2017) (citing *Zolg v. Kelly* (*In re Kelly*), 841 F.2d 908, 911 (9th Cir. 1988); *Sahagun v. Landmark Fence Co.* (*In re Landmark Fence Co.*), 801 F.3d 1099, 1102 (9th Cir. 2015); *SS Farms, LLC v. Sharp* (*In re SK Foods, L.P.*), 676 F.3d 798, 802 (9th Cir. 2012)).

## III. APPLICABLE STANDARD OF APPELLATE REVIEW

On appeal, a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*. *Motor Vehicle Cas. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 677 F.3d 869, 879 (9th Cir. 2012) (citing *Decker v. Tramiel* (*In re JTS Corp.*), 617 F.3d 1102, 1109 (9th Cir. 2010)). Because the most of the facts underlying this Appeal are virtually undisputed and the Appeal involves solely legal questions regarding whether the loan is dischargeable and in what amount, it necessarily involves interpretation of Bankruptcy Code provisions such that the Judgment and Bankruptcy Court's Judgment are subject to *de novo*

3

review. *Smith v. Rojas* (*In re Smith*), 435 B.R. 637, 642 (9th Cir. B.A.P. 2010) (citing 11 U.S.C. § 109; *Mendez v. Salven* (*In re Mendez*), 367 B.R. 109, 113 (9th Cir. B.A.P. 2007); *Soderlund v. Cohen* (*In re Soderlund*), 236 B.R. 271, 272-73 (9th Cir. B.A.P. 1999)). Any factual determinations related to the Judgment and Bankruptcy Court's Judgment that are disputed, of which there is one critical dispute, are reviewed for clear error.

## IV.   STATEMENT OF THE ISSUES PRESENTED

1.      Did the BAP err in finding that the Bankruptcy Court's Judgment entered in the state court case of *Nichols v. Pearson*, Styled Case Number 20LBCV0038, is dischargeable?

2.      Did the BAP err in finding that the entirety of the loan and/or loans given by Creditors to Debtor in the amount of $331,500 was dischargeable?

3.      Did the BAP err in finding that any portion of the loan and/or loans given by Creditors to Debtor was discharged?

4.      Did the BAP err in finding that the loan and/or loans given by Creditors to Debtor was not incurred by the taxpayer solely to pay qualified higher education expenses?

///

///

## V.     STATEMENT OF THE CASE

While Debtor disputed many of the facts before the bankruptcy court, it appears that the parties have very few disputes regarding the facts for purposes of this Appeal.

On or about July 21, 2012, Debtor married Creditors' daughter, Stephanie. 2-ER-224.[5] Prior to the marriage, in about 2011, Debtor expressed his desire to attend medical school. 2-ER-224, 228. At that time, Debtor was already an attorney, but wished to become a doctor, although "he was faced with the challenge of financing a medical education." 2-ER-224. Creditors and Debtor orally agreed that Creditors would lend Debtor all the monies required to attend medical school, and Debtor agreed that, once he completed his residency and began practicing medicine, he would repay Creditors for the monies expended on his education. 2-ER-228, 230, 233-41.

Therefore, starting in or about 2013, Debtor attended St. George's School of Medicine in Grenada ("St. George's") for medical school as a full-time student. 2-ER-229; 4-ER-630. Debtor attended St. George's from approximately 2013 to 2017. 2-ER-229; 4-ER-630. It is critical that these facts were not disputed and, in fact, were agreed by the parties in the pretrial stipulation before the bankruptcy court. 4-ER-630. While at St. George's, Debtor attended one year of medical school at Northumbria

---

[5]     Creditors cite to their Excerpts of Record citing to first the volume number, the abbreviation "ER" for "Excerpts of Record," and then the page number where the reference can be found.

University School of Medicine ("Northumbria") as part of his education at St. George's (the "SGU/NU Program"). 2-ER-229, 289, 293; 3-ER-362; 4-ER-630. While Debtor attended Northumbria for one year, because it was a study abroad program, all payments were made directly to St. George's. 2-ER-229, 289, 293; 3-ER-362, 478-79; 4-ER-630. Further, as part of his medical education at St. George's, Debtor had to complete several prerequisite undergraduate courses at St. George's. 2-ER-228. Despite evidence to the contrary, the bankruptcy court found that these courses were taken at the overall institution of St. George's University, not St. George's (the medical school), despite the fact that there was no dispute by the parties that Debtor only attended St. George's. 2-ER-228; 4-ER-623, 630.

The Bankruptcy Court, ignoring the pretrial stipulation, wrongly found that "Plaintiffs have not established that the courses he took [for the premedical school education] were offered by the school of medicine or otherwise part of any curriculum for the school of medicine itself." 2-ER-253. This was after finding that neither Creditors nor Debtor clarified whether the premedical education was at St. George's or at a different institution. 2-ER-228. The Pretrial Stipulation, however, makes clear that Debtor *only* attended St. George's and did so for his entire school career.  4-ER-623, 630. Further, the facts are undisputed that all payments for school were made to St. George's and not some other school. 2-ER-229. Because the bankruptcy court

6

wrongful found that Plaintiffs had not shown where Debtor went to school for its pre-medical school education, the bankruptcy court was in clear error on its factual finding that Debtor did not attend St. George's for the entirety of his education, including the premedical school portion of his education.[6]

For Debtor's tuition for medical school at St. George's (which included the study abroad program at Northumbria [the "SGU/NU Program"]), Creditors loaned Debtor money in the amount of $331,500 (the "Student Loan"). 4-ER-623. The bankruptcy court found that the total Student Loan was $306,301.03 based on discrepancies in the St. George's Tuition Statement (the "Tuition Statement"). 2-ER-238-39; 4-ER-677-79. The purpose of the Student Loan was for Debtor's expenses at St. George's, including tuition, books, fees, and other expenses. 2-ER-254-67; 4-ER-623. The bankruptcy court then incorrectly determined that, of the $306,301.03, $266,876.81 was for qualified education expenses because there was no showing that Debtor's first year at St. George's, when Debtor completed several prerequisite undergraduate courses, took place at St. George's. 2-ER-60. Creditors assert that the entirety of the Student Loan was for qualified higher education expenses, as shown by the Tuition Statement and that the entirety of Debtor's education, including that for

---

[6] The BAP incorrectly indicated that Creditors did not dispute the facts. 1-ER-10. However, Creditors clearly did so in their Opening Brief before the BAP. 2-ER-105-06.

the undergraduate courses, were at a qualified institution. 2-ER-289, 293; 3-ER-361, 478-79; 4-ER-677-79.

During the time Debtor was attending St. George's (and the study abroad program at Northumbria), Debtor was a taxpayer and a full time student. 2-ER-229-30, 244; 4-ER-631. Debtor received the funds for the Student Loan at various times at or about the same time the tuition for St. George's was due. 2-ER-261; 4-ER-631.

The Student Loan was for the cost of attendance of St. George's (which included Debtor's study abroad program at Northumbria). 2-ER-229-30, 238-39; 3-ER-477-78. St. George's and Northumbria were, at all relevant times, on the Federal School Code List and eligible educational institutions as defined by 26 U.S.C. § 25A(f)(2), 26 U.S.C. § 221(d)(2), and 20 U.S.C. § 1088(b). 2-ER-245-52; 3-ER-527, 529, 559. The SGU/NU Program is not an institution, nor on the Federal School Code List. 4-ER-630.

When Debtor finished medical school, Creditors sought collection of the Student Loan but Debtor refused to repay it. Therefore, Creditors filed a complaint for breach of oral contract against Debtor, commencing *Nichols v. Pearson*, styled Case Number 20LBCV0038 (the "Lawsuit"). 2-ER-227; 4-ER-632. In the Lawsuit, Creditors claimed that Debtor breached an oral contract to repay loans for Debtor's medical school. 2-ER-234; 4-ER-630. A trial took place in the Lawsuit, where

Creditors argued that they had an oral agreement with Debtor whereby Creditors agreed to loan Debtor funds to pay for medical school tuition and Debtor agreed to repay those funds. 2-ER-234-36; 4-ER-632, 653-63, 674-75, 727-805, 806-92. On or about August 24, 2021, a judgment (the "State Court Judgment") was entered in the Lawsuit in favor of Creditors, finding that Debtor did breach the oral argument to repay the medical school tuition loans to Creditors, and thus Creditors were entitled to $331,500 plus costs. 2-ER-234-36; 4-ER-632, 674-75, 727-805, 806-92.

Debtor subsequently filed a Chapter 7 bankruptcy case on October 31, 2022, styled Case Number 8:22-bk-11862-SC (the "Bankruptcy"). 2-ER-223; 4-ER-622. On February 6, 2023, Creditors filed an Adversary Complaint for Declaratory Relief Pursuant to Federal Rule of Bankruptcy Procedure 7001(a) to Declare Debt a Student Loan was Defined by 11 U.S.C. § 523(a)(8) (the "Complaint"), thereby commencing the adversary proceeding underlying this Appeal, *Nichols v. Pearson*, Adversary Case Number 8:23-ap-01011-SC (the "Adversary"). 2-ER-224; 4-ER-623.

The Adversary was litigated and a trial was held on February 25, 2025. 2-ER-222. Based on the facts and law, the bankruptcy court issued a very thoughtful and detailed Memorandum of Decision After Trial (the "Memorandum"), followed by the Bankruptcy Court's Judgment. Debtor subsequently appealed the decision of the bankruptcy court, and Creditors filed a cross-appeal, which appeals were briefed as

9

a consolidated appeal before the BAP. 2-ER-212-19. On February 27, 2026, the BAP entered the Judgment on Appeal finding the entirety of the Student Loan to be dischargeable. 1-ER-2, 20. This Appeal followed.

## VI.    SUMMARY OF ARGUMENT

Debtor, both a lawyer and a medical doctor, received a medical education from St. George's that he is currently using to practice medicine. Rather than repay the Student Loan to Creditors, however, Debtor has vigorously disputed this repayment in a number of forums, using a number of different arguments, regardless of their legal or factual merit. While Creditors recognize that the legal issues involved in this Appeal are complex and unique, the bankruptcy court's analysis was thoughtful and extensive. The BAP then utilized a mistake of fact, that is also irrelevant to the analysis, to find that the entirety of the Student Loan is dischargeable. This is inconsistent with the facts and the legal standards for dischargeability.

The bankruptcy court, BAP, Debtor, and Creditors agree on virtually all of the analysis for a determination of whether the Student Loan is dischargeable under 11 U.S.C. § 523(a)(8)(B), but the disagreements, while minor, have resulted in rulings that subvert the text and purpose of the law.

As shown by the Memorandum, the bankruptcy court gave a very thoughtful and thorough analysis of the issues in the Adversary. This included analyzing every

10

issue raised, weighing the evidence, and carefully considering the legal positions. This is an issue that is rarely litigated, and the bankruptcy court's analysis and findings should be given substantial consideration. Further, because of Debtor's insistence on raising factual matters that were (or should have been) undisputed and already decided in the Lawsuit or the Pretrial Stipulation, the bankruptcy court took great care to analyze a number of issues that should have been (and were in fact) undisputed. In doing so, the bankruptcy court both bolstered the undisputed facts, but also made one important error.

The dispute in this case concerns whether the loan at issue qualifies as a "qualified education loan" under the statutory framework of 26 U.S.C. § 221(d)(1) and, if so, the amount of the qualified education loan. The statutory language makes clear that the relevant inquiry for nondischargeability under 11 U.S.C. § 523(a)(8)(B) is whether the debt was *incurred* "solely" for "qualified higher education expenses" at an "eligible educational institution," *not* whether the specific *program* was Title IV eligible or whether the entirety of the loan was actually used "solely" for "qualified higher education expenses," as the BAP erroneously found. 1-ER-14-18. The applicable statutes contain no requirement that the program itself be Title IV eligible, and the determination rests solely on the eligibility of the institution and the

11

underlying purpose of the loan. There is no legitimate dispute that St. George's[7] was, at all relevant times, an "eligible educational institution" under Title IV. Further, the intended purpose of the Student Loan is what determines whether it was incurred for qualified higher education expenses.

While the legal framework for the issues involved in this Appeal is complex, the decision of the BAP demonstrated precisely why this framework is necessary. Creditors, in presenting the statutory framework, demonstrate while the entire analysis is important. The BAP reduced the decision of the bankruptcy court, which was incredibly detailed, into one primary issue, whether the Student Loan was "solely" for qualified higher education expenses. In doing so, the BAP incorrectly did not look at the undisputed underlying purpose of the Student Loan to pay for Debtor's attendance at medical school at St. George's. There is no dispute that, if this is the purpose, the purpose of the Student Loan was solely for qualified higher education expenses.

Instead, relying on an irrelevant mistake of fact made by the bankruptcy court, that Debtor's pre-medical school education was not at St. George's such that the expenses were not qualified higher education expenses, the BAP found that if any of the Student Loan was for not qualified higher education expenses, none of the Student

---

[7]     As discussed above, Northumbria is also an eligible educational institution under Title IV.

Loan could be nondischargeable. 1-ER-14-19. Not only is how the funds are actually used irrelevant, such that this mistake of fact should not be relevant, it ignores that the parties *agreed* that Debtor's entire education was at St. George's and that the purpose of the loan was for Debtor's education at St. George's. 2-ER-229; 4-ER-623, 630. Since the purpose of the Student Loan was solely for qualified higher education expenses, the entirety of the Student Loan is nondischargeable, such that this Court should reverse the decision of the BAP in its entirety.

Because Debtor went to an eligible educational institution when he was an eligible student and the entirety of the Loan was intended for qualified higher education expenses, this Court should reverse the Judgment on Appeal of the BAP in its entirety and affirm the Bankruptcy Court's Judgment finding that $266,876.81 of the Student Loan is nondischargeable while reversing the Bankruptcy Court's Judgment to find that the entirety of the Student Loan, in the amount of $331,500, is nondischargeable.

## VII. ARGUMENT

### A. The Statutory Framework for Determining Nondischargeability of the Student Loan is Undisputed.

Student loans are generally nondischargeable in bankruptcy absent a showing of undue hardship. 11 U.S.C. § 523(a)(8) provides that an educational loan is excepted

13

from discharge unless the debtor can prove that repayment would impose an undue

hardship on the debtor and their dependents.[8] *See Brunner v. N.Y. State Higher Educ.*

*Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).

Relevant here, 11 U.S.C. § 523(a)(8)(B) excepts from discharge:

[A]ny other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8)(B). Therefore, to be excepted from discharge pursuant to 11

U.S.C. § 523(a)(8)(B), the loan at issue must be (1) an educational loan, (2) that is a

"qualified education loan," and (3) incurred by an individual debtor. This is agreed by

Debtor and the bankruptcy court. 2-ER-197-98, 231.

The main disputed element is whether the Student Loan is a "qualified

education loan." 1-ER-14-19; *see* 2-ER-198. This analysis requires a closer

examination of several of the relevant defined terms, which are discussed below.[9]

---

[8] Debtor does not argue that repayment of the Student Loan would impose an undue hardship. 2-ER-231; *see* 2-ER-186-211.

[9] Whether a loan is an educational loan is a less stringent requirement than whether a loan is a "qualified education loan." The Bankruptcy Code does not provide a definition for "educational loan." *See In re Teran*, 638 B.R. 620, 624 (Bankr. N.D. Cal. 2022); *Gorosh v. Posner* (*In re Posner*), 434 B.R. 800, 803 (Bankr. E.D. Mich. 2010). Instead, bankruptcy courts have held that "the character of a loan should dictate how it is treated." *United Student Aid Funds v. Flint* (*In re Flint*), 238 B.R. 676, 680 (E.D. Mich. 1999) (citing *Santa Fe Med. Servs., Inc. v. Segal* (*In re Segal*), 57 F.3d 342, 349 (3d Cir. 1995)); *see also Lapusan v. Educ.*

There is no dispute that Debtor is an individual debtor or that the Student Loan is an educational loan. 2-ER-192-93, 198, 232-40.

> **1.  The Definition of "Qualified Education Loan" is Provided in 26 U.S.C. § 221(d)(1).**

11 U.S.C. § 523(a)(8)(B), when setting forth the requirement that the debt be a "qualified education loan," indicates that it is defined in 26 U.S.C. § 221(d)(1). 26 U.S.C. § 221(d)(1) defines a "qualified education loan" as:

> any indebtedness incurred by the taxpayer solely to pay **qualified higher education expenses**—
>
> > (A) which are incurred on behalf of the taxpayer, the taxpayer's spouse, or any dependent of the taxpayer as of the time the indebtedness was incurred,
> >
> > (B) which are paid or incurred within a reasonable period of time before or after the indebtedness is incurred, and
> >
> > (C) which are attributable to education furnished during a period during which the recipient was an **eligible student.**
>
> Such term includes indebtedness used to refinance indebtedness which

---

*Credit Mgmt. Corp.* (*In re Lapusan*), 244 B.R. 423, 424 (Bankr. S.D. Ill. 2000); *George Washington Univ. v. Pelzman* (*In re Pelzman*), 233 B.R. 575, 580 (Bankr. D.D.C. 1999) (a loan was an educational loan when it was "intended to allow the debtor to meet those expenses incidental to her obtaining an education" and was "plainly designed to facilitate the debtor's education"). Here, as discussed in connection with other elements below, the Student Loan was intended for Debtor's educational expenses such that it is an educational loan for purposes of this element.

qualifies as a qualified education loan. The term "qualified education loan" shall not include any indebtedness owed to a person who is related (within the meaning of section 267(b) or 707(b)(1)) to the taxpayer or to any person by reason of a loan under any qualified employer plan (as defined in section 72(p)(4)) or under any contract referred to in section 72(p)(5).

26 U.S.C. § 221(d)(1) (emphasis added). This portion of the statutory framework comes specifically from 11 U.S.C. § 523(a)(8)(B). This section of the statutory framework is also agreed by Debtor and the bankruptcy court. 2-ER-198, 243-44. The definition set forth in 26 U.S.C. § 221(d)(1) establishes five requirements:

1.      The loan must be incurred for **qualified higher education expenses**;[10]

2.      The qualified expenses were incurred by the taxpayer as of the time the indebtedness was incurred;[11]

3.      The qualified expenses were paid or incurred within a reasonable time of receiving the loan;[12]

---

[10]      This requirement also includes a requirement that the expenses must have been incurred at an **eligible educational institution**, as discussed more below.

[11]      This requirement that the "qualified higher education expenses were incurred by the taxpayer" is not disputed and therefore not discussed in this Brief. 4-ER-643; *see* 2-ER-186-211.

[12]      This requirement that the "qualified expenses were paid or incurred within a reasonable time of receiving the loan" is not disputed and therefore not discussed in this Brief. 4-ER-642; *see* 2-ER-186-211.

4.    The debtor must have been an **eligible student** at the time; and

5.    The loan is not owed to any person who is related to the taxpayer, as defined by 26 U.S.C. §§ 267(b) and 707(b)(1).[13]

*See* 26 U.S.C. § 221(d)(1) (showing the definition of "qualified education loan" has five requirements); *see generally In re In re Quintanilla*, No. 8:17-AP-00800-RCT, 2020 WL 7333590, at *4 (Bankr. M.D. Fla. Nov. 20, 2020) (discussing the requirements one must prove to meet the "definition of a qualified education loan"). Of these elements, only two are disputed in this Appeal, whether the Student Loan was incurred for qualified higher education expenses and whether Debtor was an **eligible student** at the time. Each of these requirements are further defined by statute.

### 2.    The Definition of "Qualified Higher Education Expenses" is Set Forth in 26 U.S.C. § 221(d)(2).

While 26 U.S.C. § 221(d)(1) does not specifically say where "qualified higher education expenses" is defined, 26 U.S.C. § 221(d)(2) provides such a definition. The term **"qualified higher education expenses"** is defined in 26 U.S.C. § 221(d)(2) as:

> The cost of attendance (as defined in section 472 of the Higher Education Act of 1965, 20 U.S.C. § 1087ll) at an eligible educational institution, reduced by the sum of—

---

[13]    This requirement that "the loan is not owed to any person who is related to the taxpayer, as defined by 26 U.S.C. §§ 267(b) and 707(b)(1)" is not disputed and therefore not discussed in this Brief. 4-ER-643; *see* 2-ER-186-211.

17

(A) any amount paid for such expenses (for the taxable year) as a qualified scholarship excluded from gross income under section 117, and

(B) any amount paid for such expenses (for the taxable year) using educational assistance provided under section 127.

26 U.S.C. § 221(d)(2).

Thus, qualified higher education expenses refer broadly to the **cost of attendance** at an **eligible educational institution**, including tuition, fees, books, and other necessary expenses. *See* 20 U.S.C. § 1087ll (defining "cost of attendance"). The bankruptcy court agreed that 26 U.S.C. § 221(d)(2) was the next step in the statutory framework. 2-ER-243-44.

As discussed below, this definition of "qualified higher education expenses" only requires that the institution be an eligible educational institution. 26 U.S.C. § 221(d)(2). No mention is made of eligible programs or the ability of a particular debtor to obtain certain type of funding. 26 U.S.C. § 221(d)(2). This is because the only requirement is that the institution is eligible. That inquiry ends the analysis.

///

///

///

18

**3.** **The Definition of "Eligible Educational Institution" is Specified in 26 U.S.C. § 221(d)(2) and Set Forth in 26 U.S.C. § 25A(f)(2).**

26 U.S.C. § 221(d)(2) provides the definition of an "eligible educational institution" as follows:

> For purposes of the preceding sentence, the term "eligible educational institution" has the same meaning given such term by section 25A(f)(2), except that such term shall also include an institution conducting an internship or residency program leading to a degree or certificate awarded by an institution of higher education, a hospital, or a health care facility which offers postgraduate training.

26 U.S.C. § 221(d)(2).

Thus, 26 U.S.C. § 221(d)(2) turns to 26 U.S.C. § 25A(f)(2), which defines "eligible educational institution" as:

> an institution that—
>
> (A) is described in section 481 of the Higher Education Act of 1965 (20 U.S.C. 1088), and
>
> (B) is eligible to participate in a program under title IV of such Act.

26 U.S.C. § 25A(f)(2).

Thus, an eligible educational institution is any institution that is authorized to participate in any Title IV federal student aid program. *In re Decena*, 549 B.R. 11, 21 (Bankr. E.D.N.Y. 2016), *rev'd in part*, 562 B.R. 202 (E.D.N.Y. 2016) (stating that an

19

institution's eligibility for any Title IV program is sufficient). Courts typically determine institutional eligibility by referencing the Federal School Code List, which enumerates all institutions participating in Title IV programs. *See In re Rumer*, 469 B.R. 553, 562 (Bankr. M.D. Pa. 2012).

**4.     The Definition of "Eligible Student" is Specified in 26 U.S.C. § 221(d)(3) and Set Forth in 20 U.S.C. § 1091(a)(1).**

In addition to needing a qualified educational institution, 26 U.S.C. § 221(d)(1) also requires that a "qualified education loan" must also be incurred while the borrower was an eligible student. 26 U.S.C. § 221(d)(3) defines "eligible student" as:

A student who—

(A) meets the requirements of section **484*(a)(1)*** of the Higher Education Act of 1965 [**20 U.S.C. § 1091*(a)(1)***], and

(B) is carrying at least one-half the normal full-time workload for the course of study the student is pursuing.

26 U.S.C. § 221(d)(3) (emphasis added).

20 U.S.C. § 1091(a)(1) further defines eligibility as being:

enrolled or accepted for enrollment in a degree, certificate, or other program leading to a recognized educational credential at an institution of higher education that is an eligible institution in accordance with the provisions of section 487 [20 U.S.C. § 1094].

20 U.S.C. § 1091(a)(1).

20

Thus, to be an "eligible student," a debtor must have been:

1.      Enrolled in a degree or certificate program;

2.      At an institution that was eligible to participate in any program under Title IV; and

3.      Taking course work at least half-time.

This statute does not require that a specific program within the institution be eligible for Title IV funding—only that the institution be eligible. *See In re Rumer*, 469 B.R. at 562 (holding that an institution's overall Title IV status controls). Further, to be "eligible" within the meaning of 26 U.S.C. § 221(d)(3), the student must only meet the requirements of subsection (a)(1) of 20 U.S.C. § 1091.[14] The bankruptcy court and BAP agree on this point. 1-ER-11-14; 2-ER-233-53. At this point, diverging from the statutory framework, Debtor seeks to expand the statutory universe to other provisions that are not only irrelevant but cannot be used to change the plain meaning of the statutes. For example, Debtor places emphasis on 20 U.S.C. § 1088 for determination of an institution's eligibility to determine a student's eligibility under

---

[14]      A student's eligibility for other purposes (such as obtaining a loan from the federal government) depends on additional requirements, such as the student must, *inter alia*, meet all subsections of 20 U.S.C. § 1091 (*e.g.*, pursuant to subsection (a)(6), the student cannot be convicted of a felony crime involving fraud in obtaining student loan funds, and under (a)(2), the student must be maintaining a satisfactory progress toward their degree).

20 U.S.C. § 1091. 2-ER-199-200. That statute is not referenced anywhere in the statutory framework and is irrelevant. Instead, 20 U.S.C. § 1091 refers only to the ability to obtain a grant, loan, or work assistance under that chapter. *See* 20 U.S.C. § 1091; 2-ER-199-200. The ability to obtain a particular type of financing does not determine a student's eligibility for dischargeability.

Because the statutory framework is almost completely agreed between Debtor, the bankruptcy court, and Creditors, simple application of this statutory framework to the facts shows the Student Loan is nondischargeable.

**B.** **The Bankruptcy Court Correctly Determined that St. George's is an Eligible Educational Institution, and Whether St. George's is an "Eligible Educational Institution" is the Only Relevant Inquiry, Not Whether SGU/NU Program is an "Eligible Program."**

The debt at issue is nondischargeable because it satisfies the statutory definition of a "qualified education loan" under 26 U.S.C. § 221(d)(1), which requires only that the loan be *incurred* for "qualified higher education expenses" at an "eligible educational institution." Debtor appears to argue that, because his specific program of study was ineligible for Title IV funding, the Student Loan does not qualify as an educational loan under 11 U.S.C. § 523(a)(8)(B). The statutes do not support this position.

22

### 1. The Bankruptcy Court Correctly Determined that St. George's Was an Eligible Educational Institution.

First, for Debtor to argue that an eligible program is required for nondischargeability, Debtor confuses and merges the definitions of an "eligible educational institution" and a qualified program. Debtor seems to suggest that institutional eligibility would be meaningless unless every single program offered by an institution is eligible for federal funding. 2-ER-200. However, as discussed above, not only is this not the test for dischargeability, but whether an institution is eligible has no bearing on whether all of its programs are eligible.

Section 523(a)(8)(B) makes nondischargeability contingent on whether a debtor incurred the loan for expenses at an eligible educational institution, not whether a particular program within that institution was eligible. Under 26 U.S.C. § 25A(f)(2), an "eligible educational institution" is simply one that is authorized to participate in *any* Title IV program. Courts interpreting this provision have emphasized that institutional eligibility is the relevant consideration. *See, e.g., In re Decena*, 549 B.R. at 21 (holding that an institution's inclusion on the Federal School Code List was sufficient to establish eligibility under the statute). Similarly, the bankruptcy court in *In re Rumer* looked to whether the institution was listed as Title IV-eligible and did not require analysis of program-specific eligibility. 469 B.R. at 562. As such, because

23

St. George's is an eligible educational institution, the Student Loan is nondischargeable.

Here, there is no dispute that St. George's was an eligible educational institution under Title IV.[15] 4-ER-630, 632. This fact alone is dispositive.

Further, the evidence considered by the bankruptcy court determined that St. George's is an eligible educational institution. The bankruptcy court correctly indicated that the Federal School Code List provided that St. George's was an eligible educational institution for the relevant time period. 2-ER-245-51. In so doing, the bankruptcy court made a number of factual findings, which Debtor does not challenge, that support that St. George's was an eligible educational institution. This evidence included the 2011 Letter from the U.S. Department of Education (the "2011 Letter"), Debtor's testimony, Debtor's admission that St. George's was on the Federal School Code List for the relevant years and was an eligible educational institution, Creditors' expert witness, and the Federal School Code Lists for the relevant years. 2-ER-247-49; 4-ER-677-79, 806-9. This evidence is not challenged and shows why St. George's was an eligible educational institution.

---

[15]     Debtor also admitted that Northumbria is an eligible educational institution under Title IV. 4-ER-630, 633.

Finally, the statute does not require that a program be Title IV eligible. Debtor also insinuates that, for the debt to be dischargeable, the program must be eligible for Title IV funds. 2-ER-200-04. This argument improperly imports a requirement that does not exist in the statutory framework. Neither 11 U.S.C. § 523(a)(8)(B) nor 26 U.S.C. § 221(d)(1) requires that a specific program be eligible for Title IV funding. Rather, the statute focuses on whether the institution is an "eligible educational institution." Under 26 U.S.C. § 25A(f)(2), an "eligible educational institution" is one that is eligible to participate in *any* Title IV program. This is the only institutional requirement under the statute. Courts have consistently looked to institutional eligibility—rather than programmatic eligibility—when determining whether a school qualifies as an "eligible educational institution." *See*, *e.g.*, *In re Decena*, 549 B.R. 11, 21 (Bankr. E.D.N.Y. 2016), *rev'd in part*, 562 B.R. 202 (E.D.N.Y. 2016) (noting that the Federal School Code List was relevant in determining whether an institution was eligible); *In re Rumer*, 469 B.R. at 562 (taking judicial notice of an institution's inclusion on the FAFSA list of Title IV-eligible schools).

A loan's dischargeability under 11 U.S.C. § 523(a)(8)(B) depends only on whether it was incurred for "qualified higher education expenses" at an eligible educational institution—not whether the student could have received federal aid. The definition of a "qualified education loan" is independent of federal student aid

eligibility. This is because 26 U.S.C. § 221(d)(1) sets forth specific criteria for what constitutes a "qualified education loan," and Title IV eligibility is not one of those criteria. Debtor's argument improperly conflates the two.

As such, this Could should find that St. George's was an eligible educational institution.

### 2. The Bankruptcy Court Incorrectly Determined that Debtor Attended a Different Institution Than St. George's for his Premedical School Education.

As discussed above, the only relevant inquiry was whether St. George's was an eligible institution. This is because Debtor only attended St. George's and made all payments to St. George's. 2-ER-229; 4-ER-630. The bankruptcy court, ignoring the Pretrial Stipulation, wrongly found that "Plaintiffs have not established that the courses he took [for the premedical school education] were offered by the school of medicine or otherwise part of any curriculum for the school of medicine itself." 2-ER-253. The Pretrial Stipulation, however, makes clear that Debtor *only* attended St. George's and did so for his entire school career. 4-ER-623, 630. Morever, because it was unclear on the record where Debtor attended his premedical education, 2-ER-228, the Pretrial Stipulation must control. Further, the facts are undisputed that all payments for school were made to St. George's and not some other school. 2-ER-229.

26

The Tuition Statement shows the payments being made to the same institution, St. George's, because the SGU/NU Program took place through St. George's. 3-ER-478-79; 4-ER-807-92. These undisputed and stipulated facts show that Creditors *did* present evidence of where Debtor did his premedical school education, and it was at St. George's. This factual finding of the bankruptcy court was in clear error and led to the erroneous findings of the BAP. This Court should find that the bankruptcy court had a clear error as to this factual finding.

Regardless of this Court's ruling on this factual issue, however, as discussed below, this finding should be immaterial. How the funds are actually used is not the appropriate test; the only appropriate test is the purpose of the loan. Because it is clear that the Student Loan was solely for the purpose of paying Debtor's qualified higher education expenses, this ends the inquiry, as discussed below.

Consequently, this Court should find that Debtor attended only St. George's and that St. George's is an eligible educational institution.

### 3. Debtor Was an "Eligible Student."

In addition to attending an eligible educational institution, Debtor must also have been an eligible student. As discussed above, under 26 U.S.C. § 25A(b)(3), an "eligible student" is one who: (A) meets the requirements of 20 U.S.C. § 1091(a)(1);

and (B) carries at least half-time course work in pursuit of a recognized degree. 26 U.S.C. § 25A(b)(3).

Here, Debtor attempts to argue that he was not an eligible student. 2-ER-197-204. The bankruptcy court rejected this argument, finding Debtor to be an eligible student. 2-ER-261-62. Further, the Pretrial Stipulation confirms that Debtor was a full-time student at St. George's pursuing a medical degree. 4-ER-631.This satisfies both prongs of the statutory definition. There is no statutory basis to conclude that a student ceases to be "eligible" simply because his particular program was ineligible for Title IV aid, assuming that the program was in fact ineligible for such aid. The line of inquiry relating to the eligibility of programs is irrelevant. Because Debtor is an eligible student under 20 U.S.C. § 1091(a)(1), the analysis is complete and the Student Loan is nondischargeable.

### 4. Conclusion.

The statutory framework governing student loan dischargeability under 11 U.S.C. § 523(a)(8)(B) focuses on institutional eligibility, not program eligibility. St. George's is an "eligible educational institution" as defined by statute, and nothing in the relevant provisions conditions loan nondischargeability on a specific program's Title IV eligibility.

28

Even if program eligibility were relevant, Debtor still qualifies as an "eligible student" under the statutory definition. Debtor was a full-time student who obtained a medical degree from St. George's, satisfying the necessary criteria. Therefore, this Court should hold that the Student Loan remains nondischargeable under 11 U.S.C. § 523(a)(8)(B).

**C.      The Entirety of the Student Loan, in the Amount of $331,500, is for Qualified Higher Education Expenses.**

Because the facts and law are clear that the Student Loan is nondischargeable, the only issue that remains is whether the entirety of the Student Loan was for "qualified higher education expenses," as defined 26 U.S.C. § 221(d)(2). As stated above, the term "qualified higher education expenses" is defined in 26 U.S.C. § 221(d)(2) as:

> The cost of attendance (as defined in section 472 of the Higher Education Act of 1965, 20 U.S.C. 1087ll) at an eligible educational institution, reduced by the sum of—
>
> (A) any amount paid for such expenses (for the taxable year) as a qualified scholarship excluded from gross income under section 117, and
>
> (B) any amount paid for such expenses (for the taxable year) using educational assistance provided under section 127.

26 U.S.C. § 221(d)(2). "Cost of attendance" is further defined in 20 U.S.C. § 1087ll, which delineates a number of different costs of attendance. Courts have explained: "[b]roadly speaking, COA [cost of attendance] includes a student's tuition and fees, room and board, and reasonable living expenses." *Livingstone v. Walden Univ., LLC*, No. CV 22-3096-BAH, 2023 WL 8806616, at *1, n.2 (D. Md. Dec. 20, 2023); *In re Rogers*, 374 B.R. 510, 514 (Bankr. E.D.N.Y. 2007).

Here, the Tuition Statement is for expenses that are clearly within what constitutes "cost of attendance." It shows student fees and tuition, 20 U.S.C. § 1087ll(1), book fees and other course material fees, 20 U.S.C. § 1087ll(2), health and dental insurance, 20 U.S.C. § 1087ll(4)-(5), housing, 20 U.S.C. § 1087ll(5) and (9), and malpractice and other insurance, 20 U.S.C. § 1087ll(12). 4-ER-677-79. Every single item on the Tuition Statement clearly is for a "qualified higher education expense."

The Tuition Statement totals $324,130.03, and the bankruptcy court found that, while the total Student Loan was $331.500, only $266,876.81 is nondischargeable. This was from finding both that there was an accounting error on the Tuition Statement and from finding that a portion of the Student Loan was for Debtor's undergraduate education. 2-ER-237-240, 260-61. As discussed above, Debtor only attended St. George's and only paid St. George's, such that all of the expenses

30

necessarily were for qualified higher education expenses, such this factual finding should be reversed on appeal as clear error. Further, regardless of where Debtor attended school, it is undisputed that the purpose of the Student Loan was to fund Debtor's medical school education. This purpose is undisputed and supports a finding that the entirety of the Student Loan is nondischargeable regardless of how it was ultimately used.

26 U.S.C. § 221(d)(1) makes it plain that the relevant question is whether the "indebtedness incurred by the taxpayer [is] solely to pay qualified higher education expenses." 26 U.S.C. § 221(d)(1); *see also* 2-ER-266. As such, the appropriate inquiry is whether the Student Loan was incurred solely to pay qualified higher education expenses, looking to the purpose of the loan, not the actual use. Using this reasoning, the entirety of the Student Loan was incurred for Debtor's qualified higher education expenses at St. George's.

Moreover, Creditors assert that the entirety of the Student Loan was for qualified higher education expenses, including the first year of premedical classes, for the reasons discussed above. The reality is that the *only* evidence presented shows that Debtor attended an eligible educational institution, St. George's, when taking his first year of premedical classes and that these were qualified education expenses. The Pretrial Stipulation's undisputed facts require this finding. 2-ER-229-30; 4-ER-623,

31

630. As such, this Court should reverse this finding of the bankruptcy court and find that the entirety of the Student Loan is nondischargeable as a matter of law.

With this factual issue corrected, it becomes evident that the only conclusion can be that the entirety of the Student Loan is nondischargeable.

However, even without that correction in the factual findings, it is not disputed that the sole purpose of the Student Loan was to fund Debtor's medical school education. 2-ER-227-30; 4-ER-623, 630. Because the only purpose of the Student Loan was to pay for qualified higher education expenses, the entirety of the Student Loan is nondischargeable, irrespective of whether portions of it may not have been actually used for that purpose, as ultimately found by the bankruptcy court.

What is key is that the overall *purpose* of the entirety of the Student Loan was always to allow Debtor to attend medical school at St. George's. 2-ER-227-30; 4-ER-623, 630. That is the entire purpose of the Student Loan, and the expenses actually incurred by Debtor reflect that purpose. Moreover, most of the expenses incurred by Debtor were qualified higher education expenses regardless of the underlying factual findings. As such, the purpose of the Student Loan controls as a matter of law. This is supported by the statutory framework and the cases interpreting it.

Pursuant to IRC Section 221 a qualified educational loan "means any indebtedness incurred by the taxpayer solely to pay qualified higher education

32

expenses—. . ." "Qualified higher education expenses" means the "cost of attendance" at an eligible educational institution.

To determine whether a loan was incurred "solely" to pay qualified higher education expenses, application of the "purpose" test is required. Pursuant to the "purpose" test, the Court looks to the initial purpose of the loan rather than how the loan proceeds were actually used to determine if the loan was incurred "solely" to pay qualified education expenses. *See In re Conti*, 982 F.3d 445, 449 (6th Cir. 2020); *In re Homaidan*, 646 B.R. 550, 589 (Bankr. E.D.N.Y. 2022) (agreeing the initial purpose test is the correct test to apply); *Quintanilla v. Nelnet Servicing LLC* (*In re Quintanilla*), 2020 WL 7333590, 2020 Bankr. LEXIS 3514 (Bankr. M.D. Fla. 2020); *In re Monyak*, No. 19-17712, 2021 WL 371753, at *4 (Bankr. N.D. Ohio Feb. 2, 2021). Thus, the sole inquiry under the "purpose" test is whether the initial purpose of the loan was to fund qualified higher education expenses; if the answer is yes, then the loan, no matter the amount or how it was spent, is non-dischargeable. *See In re Mazloom*, 648 B.R. 1, 12–14 (Bankr. N.D.N.Y. 2023) ("The plain text of § 523(a)(8)(B) requires looking to the stated purpose of the loan at the time of the agreement, rather than supplementing the stated purpose with ancillary information from the debtor's use of the loan funds.").

33

This test prevents a debtor from discharging a private student loan if the debtor misuses the funds for a non-educational purpose. *See In re Conti*, 982 F.3d at 449; *In re Homaidan*, 646 B.R. at 589. As one court explained, any other test would permit students "to discharge student loans in bankruptcy because the student spent the money on social uses, alcohol, or even drugs," which "would create an absurd result." *In re Murphy*, 282 F.3d 868, 873–74 (5th Cir. 2002); *see also In re Maas*, 497 B.R. 863, 870 (Bankr. W.D. Mich. 2013), *aff'd sub nom. Maas v. Northstar Educ. Fin., Inc.,* 514 B.R. 866 (W.D. Mich. 2014) ("Focusing the analysis on the purpose of the loan, rather than the use of the proceeds, also avoids potential inequities that could result from application of a "use" test.").

Correctly using this test, the bankruptcy court properly found *Quintanilla* persuasive and looked at the "stated purpose" of the Student Loan. 2-ER-264. In *Quintanilla,* the debtor obtained a loan from Nelnet for "qualified educational expenses" at an "eligible educational institution." *See* 2020 WL 7333590, at *5. However, because of a delay in the issuance of the funds, the debtor did not use the funds as intended. *See id.* Therefore, the debtor argued that the loan was not incurred solely to pay for qualified higher education expenses. When deciding this issue, bankruptcy court reasoned that "to determine whether the Loan was solely to pay for 'qualified higher education expenses,' a debtor's stated purpose in taking out the Loan

34

should be examined rather than how the debtor actually spent the funds." *Id.* The bankruptcy court further analyzed the terms and conditions of the loan and found that they were clear that the proceeds would be used for qualified educational expenses incurred at an eligible educational institution, such that the loan was incurred "solely" to pay for qualified education expenses irrespective of how the debtor actually spent the funds. *See id.*

The "stated purpose" analysis in *Quintanilla* is the same analysis used consistently by bankruptcy courts when determining whether a loan was incurred by a debtor solely to pay qualified higher education expenses under 26 U.S.C. § 221(d)(1). *See, e.g., Conti v. Arrowood Indem. Co.*, 612 B.R. 877, 881 (E.D. Mich. 2020), *aff'd sub nom. In re Conti*, 982 F.3d 445 (6th Cir. 2020) (rejecting the debtor's argument that "the use of the term 'solely' in § 221(d)(1) means that 'if the proceeds of the loans . . . could be used for anything other than qualified higher education expenses—even one thing—the loans are not qualified loans and may be discharged'" and holding "that the question of whether [debtor's] loans are 'qualified educational loans' under § 523(a)(8)(B) should be determined by examining the purpose of the loan, rather than how the debtor actually spent the loan proceeds"); *In re Jean-Baptiste*, 584 B.R. 574, 585 (Bankr. E.D.N.Y. 2018) ("Courts have held that the stated purpose and not the actual use of the loan determines whether a loan is an

35

'educational loan' excepted from discharge under § 523(a)(8)."). In fact, as noted by the District Court in *Conti*, any other analysis would lead to absurd results. *See Conti*, 612 B.R. at 881.

The BAP, relying on *In re Homaidan*, however, imposed an additional requirement that the loan even if the purpose test is met: that the loan must not exceed the cost of attendance. 1-ER-18-19. In other words, pursuant to the BAP's decision, if the loan is made in an amount in excess of the cost of attendance, the loan is automatically dischargeable, no matter what the purpose was for the loan. The BAP's ruling (and the court in *Homaidan*) however went too far and incorrectly applied the Sixth Circuit's analysis from *Conti* addressing how to determine the purpose of loan.

In *Conti*, the Sixth Circuit held that a "loan's purpose is centrally discerned from the lender's agreement with the borrower." *In re Conti*, 982 F.3d 445, 449 (6th Cir. 2020). The court then explained that, to the extent there is a need to look beyond the loan documents to determine the loan's purpose, the court looks to other circumstances. *See id.* In *Conti*, the court looked to who received the funds and whether the loan exceeded the cost of attendance. *See id.* While both the BAP and the bankruptcy court in *Homaidan* relied on *Conti* to make their rulings, 1-ER-18-19; and 2-ER-255, 267, *Conti* did not hold that a finding that a loan exceeded the cost of attendance would be dispositive as the bankruptcy court correctly indicated, 2-ER-

36

267; *see In re Conti*, 982 F.3d at 449. Instead, as indicated in *Conti*, this is merely one factor to consider when determining the "purpose" test. Further, finding that this factor would be dispositive would go against the public policy of nondischargeability and allow debtors to discharge student loans if the loan amount exceeds the cost of attendance in *any* amount.

Other courts have correctly applied the purpose test as a totality of the circumstances test. *See*, *e.g.*, *In re Mallett,* 625 B.R. 553, 558 (Bankr. M.D. Fla. 2021) (the court noted that while loan documents were not submitted into evidence, the evidence that was offered was not rebutted and thus the bankruptcy court found that the lender met the "purpose" test); *In re Sokolik*, 635 F.3d 261, 267 (7th Cir. 2011) (the Seventh Circuit Court of Appeals held "that it is the purpose of a loan which determines whether it is 'educational,'" and then looked to the facts and circumstances surrounding the agreement to decide the purpose of the loan); *In re Murphy*, 282 F.3d 868, 873 (5th Cir. 2002) (applying the purpose test, the court looked to the circumstances surrounding the loan at the time it was made and found that the evidence in the particular case, which was limited to the note and "debtor's testimony that he borrowed the funds to support his full-time attendance," supported a finding that the loan was made for the purpose of paying qualified higher education expenses).

37

Finally, one court even recognized that any consideration of how the loan funds are spent when determining the purpose of the loan would be improper. *In re Mazloom*, 648 B.R. at 12–14. More specifically, in *Mazloom*, the debtor argued that the court should "apply the purpose test at a high level of generality, arguing the purpose here should be read as 'educational' only, and that the Court should then look beyond the stated purpose to the actual use to determine the more specific purpose" (*e.g.*, that the funds were actually spent at a Title IV university). *See id.* The court rejected this argument and explained that if this argument were adopted, "then the purpose of the loan would not be determinable at the time the agreement was made." *See id.* Accordingly, the Court's sole focus should be on the agreement between the lender and the borrower and not on any acts or conduct of the parties after the agreement was made.

Evidence was offered at trial that showed the purpose of the Student Loan was for Debtor to attend St. George's, which is an eligible educational institution. 2-ER-224, 228. There was no other purpose for the Student Loan.[16] 2-ER-224, 228.

---

[16]    The bankruptcy court, finding that a portion of the Student Loan was not incurred solely to pay qualified higher education expenses, used the ratio of what was actually used to pay qualified higher education expenses with those that were not actually used to pay qualified higher education expenses. 2-ER-266. The purpose of this comparison of the intent of the Student Loan to the actual use of the Student Loan was to show the intent of the Student Loan. Because Debtor does not dispute that a large portion of the Student Loan was paid to St. George's for his

38

Therefore, the Student Loan was incurred solely to pay for qualified educational expenses, and thus, regardless of how the Student Loan was ultimately used, the bankruptcy court correctly found that the Student Loan fit the definition of 26 U.S.C. § 221(d)(1).

This is especially appropriate when considering that all of the expenses were for qualified higher education expenses. The Student Loan was incurred to pay for Debtor's medical school and the entirety of the Student Loan was used to pay St. George's, as evidenced by the Tuition Statement, despite the Debtor's and the BAP's contentions that the first year of undergraduate study disqualifies that year's worth of expenses as being qualified higher education expenses. There is no dispute that all payments were made to St. George's and were to allow Debtor to ultimately obtain a medical degree, which he did. To view the statute any other way would allow individuals, like Debtor, to incur legitimate, nondischargeable student loans and then convert them to a dischargeable loan by misusing the funds. This was not the legislative intent, and it would go against public policy.

---

medical school expenses, it is evident that Debtor agrees that his intent to incur the Student Loan was solely for qualified higher education expenses. Just because a possible technicality may have rendered the actual use of a portion of the Student Loan for something other than qualified higher education expenses does not change that analysis. The Student Loan was always solely for the purpose of paying qualified higher education expenses. This is sufficient to make the entirety of the Student Loan nondischargeable as a matter of law.

39

The BAP, instead of making the clear decision that the purpose of the Student Loan was solely for qualified higher educational expenses, relied on the example of a "mixed-use" loan provided in the C.F.R., which shows Congress intended "mix-use" loans to be excluded from the definition of a qualified educational loan pursuant to 26 U.S.C. § 221(d)(1). 1-ER-17-18. This example, however, shows precisely why the Student Loan was solely for qualified higher educational expenses and why the bankruptcy court was correct with its reasoning and reliance on *Quintanilla* and the numerous other courts who conducted the same analysis. 26 C.F.R. § 1.221-1(e)(4) sets forth several examples of loans that do or do not fit the definition of "qualified education loan." Importantly, this list is not exhaustive, and there is no legal authority to show how these examples should be used in a analysis of a nondischargeable student loan. Notwithstanding this, the example relied upon by the BAP supports Creditors' and bankruptcy court's analysis. Specifically, the example relied on by the BAP is as follows:

Example 6. Mixed-use loans.

Student J signs a promissory note for a loan secured by Student J's personal residence. Student J will use part of the loan proceeds to pay for certain improvements to Student J's residence and part of the loan proceeds to pay qualified higher education expenses of Student J's spouse. Because Student J *obtains the loan* not solely to pay qualified higher education expenses, the loan is not a qualified education loan.

40

26 C.F.R. § 1.221-1(e)(4); *see also* 1-ER-17-18; 2-ER-209. As shown above, the example concludes that the "mix-use" loan does not fit the definition of a "qualified education loan" because the student did not obtain the loan solely for qualified higher education expenses. This leads to the conclusion that the reason for the loan (*i.e.*, why the student obtained the loan in the first instance) is the key issue. This example supports the bankruptcy court's "stated purpose" analysis, which requires an examination of the why the loan was obtained when deciding whether the Student Loan was incurred solely for "qualified education expenses." 2-ER-264-67. This example assumes that the purpose of the loan was not incurred solely for higher education expenses and/or looks to the actual use of the funds. Thus, relying on the example was incorrect because the "mixed-use" example does not state what the purpose of the loan was and instead focuses solely on how the student used the funds. Because the actual use test is not the proper test, the BAP erred when it found the example persuasive. Here, there is no dispute that the Student Loan was incurred for Debtor's medical school education at St. George's. Consequently, the Student Loan was incurred solely for "qualified education expenses."[17]

---

[17]     Another way to resolve this dispute is find that the Student Loan was instead a series of loans, some of which are dischargeable and some of which are nondischargeable. It is undisputed that the Student Loan was made over time in different amounts. 2-ER-261. To the extent the Court requires such a finding, the factual record clearly supports it.

For these reasons, the bankruptcy court's analysis and conclusion wer correct that, irrespective of how the funds were spent, because of the purpose for the Student Loan,[18] the Student Loan was a qualified education loan pursuant to 26 U.S.C. § 221(d)(1). This analysis is more efficient for the courts, in addition to being correct, because:

> The "purpose' test avoids th[e] potential problem by refocusing the inquiry on the nature and character of the loan. For example, rather than trying to determine whether a computer purchased with loan money was used for schoolwork, personal use or some combination of both, we need only ask whether the lender's agreement with the borrower was predicated on the borrower being a student who needed financial support to get through school.

*In re Sokolik*, 635 F.3d 261, 266 (7th Cir. 2011). Because the Student Loan was solely for the purpose of paying for Debtor's medical school education, which are qualified higher education expenses, the entirety of the Student Loan is nondischargeable.

///

///

---

[18] Further, even if all amounts loaned to Debtor were not for "qualified educational expenses," the amount attributable to $266,876.81 still met the definition of section 221(d) by conducting a statutory interpretation analysis. The bankruptcy court correctly reasoned that section 221(d) defined a "qualified education loan" as "any indebtedness," which in turn is defined broadly as a debt. 2-ER-266-67. Thus, because $266,876.81 was clearly a "debt" incurred solely to pay for qualified higher education expenses, this amount is a qualified educational loan. This reasoning was not rebutted by Debtor or the BAP and is legally and factually correct.

42

### D.     Public Policy Supports a Finding that the Entire Student Loan is Nondischargeable.

For Debtor to be able to discharge the entirety of the Student Loan based on a finding that a portion of it was not actually used for qualified higher educational expenses puts an undue burden on lenders who are lending to debtors. The reason the "purpose" test exists is so that a lender can rely on the purpose of the loan in making the loan, not the technicalities required to monitor how the funds are actually used. The fact that the loan must be solely for qualified higher educational expenses is a high enough burden, especially considering the statutory quagmire that exists for certain educational institutions, such as St. George's. It is enough that the loan was for Debtor's education at St. George's. Even if the premedical school education did not constitute a qualified higher education expense and even if the Student Loan was more than actually incurred for qualified higher education expenses, it is irrelevant and would discourage lenders from lending to debtors.

Further, the legislative history supports a broad interpretation. Congress enacted 11 U.S.C. § 523(a)(8) to limit the dischargeability of student loans, ensuring that individuals who benefit from an education remain responsible for their obligations. There is no indication that Congress intended to tie nondischargeability to programmatic eligibility, or how the loan funds were actually used. Rather, the

43

legislative focus has always been on whether the debtor *incurred* the debt for educational expenses at a qualifying institution.

Permitting discharge based on a funding distinction drawn by the Department of Education or the actual use of the funds would create an unintended inconsistency in bankruptcy law. Borrowers attending the same institution could have radically different outcomes depending on whether their specific course of study received federal aid or whether they used the loan funds for other purposes, even if they obtained the same degree from the same school. Such an approach would lead to inequitable results and is inconsistent with the statutory scheme.

The purpose of 11 U.S.C. § 523(a)(8)(B) is to prevent abuse of the bankruptcy system by ensuring that borrowers cannot easily discharge education-related debts. *See Roth v. Educational Credit Mgmt. Corp.* (*In re Roth*), 490 B.R. 908, 916 (9th Cir. B.A.P. 2013) ("Congress enacted § 523(a)(8) in part to prevent abuses by students who borrowed money for their education and then sought to discharge the debt soon after graduation."). Allowing debtors to escape repayment obligations based on administrative determinations about federal aid eligibility or the failure to monitor how the loans are actually spent would create arbitrary loopholes that undermine the statute's intent.

Additionally, policy considerations favor non-dischargeability. Debtor obtained a medical degree from St. George's and derived the full benefit of the education funded by the Student Loan. Allowing dischargeability based on programmatic eligibility would produce an unjust result, permitting Debtor to retain the benefit of an advanced degree while shifting the financial burden to Creditors. Courts have consistently rejected attempts to exploit loopholes in 11 U.S.C. § 523(a)(8), emphasizing that student loan debt is to be repaid absent undue hardship. *See Brunner*, 831 F.2d at 396.

Creditors should not bear the cost of an administrative funding decision that had no bearing on Debtor's actual enrollment or educational attainment. Debtor's argument elevates a technicality over the statute's fundamental purpose and should be rejected. In short, the Student Loan should be nondischargeable in its entirety.

///

///

///

## VIII. CONCLUSION

For these reasons, it is evident that the Student Loan is a nondischargeable student loan in its entirety. This Court should reverse the decision of the BAP and find that the entirety of the Student Loan, in the amount of $331,500, is nondischargeable.

Respectfully submitted,

HABERBUSH, LLP

Dated: June 10, 2026

By: /s/ Vanessa M. Haberbush
VANESSA M. HABERBUSH, ESQ.,
Attorneys for Appellants, Rob and Cora
Nichols

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because:

This brief contains 10,670 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because:

This brief has been prepared in proportionally spaced typeface using WordPerfect X6 at Times New Roman 14 pt.

Respectfully Submitted,

HABERBUSH, LLP

Dated: June 10, 2026          By: /s/ Vanessa M. Haberbush

VANESSA M. HABERBUSH, ESQ., Attorneys for Appellants, Rob and Cora Nichols

## CERTIFICATION REQUIRED BY CIRCUIT RULE 28-2

Case Nos.: 26-1962 and 26-1963

The undersigned certifies that the following are known related cases and appeals:

*Rob and Cora Nichols v. James Lawrence Pearson*, United States Court of Appeals for the Ninth Circuit, Case Numbers 26-1962 and 26-1963, which are both pending before this Court and treated as a consolidated appeal in this Appeal.

Dated: June 10, 2026                    By: /s/ Vanessa M. Haberbush
                                        VANESSA M. HABERBUSH, ESQ.,
                                        Attorneys for Appellants, Rob and Cora
                                        Nichols

**ADDENDUM**

**26 C.F.R. § 1.221-1**

(a) In general–

(1) Applicability. Under section 221, an individual taxpayer may deduct from gross income certain interest paid by the taxpayer during the taxable year on a qualified education loan. See paragraph (b)(4) of this section for rules on payments of interest by third parties. The rules of this section are applicable to periods governed by section 221 as amended in 2001, which relates to deductions for interest paid on qualified education loans after December 31, 2001, in taxable years ending after December 31, 2001, and on or before December 31, 2010. For rules applicable to interest due and paid on qualified education loans after January 21, 1999, if paid before January 1, 2002, see § 1.221–2. Taxpayers also may apply § 1.221–2 to interest due and paid on qualified education loans after December 31, 1997, but before January 21, 1999. To the extent that the effective date limitation (sunset) of the 2001 amendment remains in force unchanged, section 221 before amendment in 2001, to which § 1.221–2 relates, also applies to interest due and paid on qualified education loans in taxable years beginning after December 31, 2010.

49

(2) Example. The following example illustrates the rules of this paragraph (a). In the example, assume that the institution the student attends is an eligible educational institution, the loan is a qualified education loan, the student is legally obligated to make interest payments under the terms of the loan, and any other applicable requirements, if not otherwise specified, are fulfilled. The example is as follows:

Example. Effective dates. Student A begins to make monthly interest payments on her loan beginning January 1, 1997. Student A continues to make interest payments in a timely fashion. However, under the effective date provisions of section 221, no deduction is allowed for interest Student A pays prior to January 1, 1998. Student A may deduct interest due and paid on the loan after December 31, 1997. Student A may apply the rules of § 1.221–2 to interest due and paid during the period beginning January 1, 1998, and ending January 20, 1999. Interest due and paid during the period January 21, 1999, and ending December 31, 2001, is deductible under the rules of § 1.221–2, and interest paid after December 31, 2001, is deductible under the rules of this section.

(b) Eligibility—

(1) Taxpayer must have a legal obligation to make interest payments. A taxpayer is entitled to a deduction under section 221 only if the taxpayer has a

50

legal obligation to make interest payments under the terms of the qualified education loan.

(2) Claimed dependents not eligible—

(i) In general. An individual is not entitled to a deduction under section 221 for a taxable year if the individual is a dependent (as defined in section 152) for whom another taxpayer is allowed a deduction under section 151 on a Federal income tax return for the same taxable year (or, in the case of a fiscal year taxpayer, the taxable year beginning in the same calendar year as the individual's taxable year).

(ii) Examples. The following examples illustrate the rules of this paragraph (b)(2):

Example 1. Student not claimed as dependent. Student B pays $750 of interest on qualified education loans during 2003. Student B's parents are not allowed a deduction for her as a dependent for 2003. Assuming fulfillment of all other relevant requirements, Student B may deduct under section 221 the $750 of interest paid in 2003.

Example 2. Student claimed as dependent. Student C pays $750 of interest on qualified education loans during 2003. Only Student C has the legal obligation to make the payments. Student C's parent claims him

51

as a dependent and is allowed a deduction under section 151 with respect to Student C in computing the parent's 2003 Federal income tax. Student C is not entitled to a deduction under section 221 for the $750 of interest paid in 2003. Because Student C's parent was not legally obligated to make the payments, Student C's parent also is not entitled to a deduction for the interest.

(3) Married taxpayers. If a taxpayer is married as of the close of a taxable year, he or she is entitled to a deduction under this section only if the taxpayer and the taxpayer's spouse file a joint return for that taxable year.

(4) Payments of interest by a third party—

(i) In general. If a third party who is not legally obligated to make a payment of interest on a qualified education loan makes a payment of interest on behalf of a taxpayer who is legally obligated to make the payment, then the taxpayer is treated as receiving the payment from the third party and, in turn, paying the interest.

(ii) Examples. The following examples illustrate the rules of this paragraph (b)(4):

Example 1. Payment by employer. Student D obtains a qualified education loan to attend college. Upon Student D's graduation from

52

college, Student D works as an intern for a non-profit organization during which time Student D's loan is in deferment and Student D makes no interest payments. As part of the internship program, the non-profit organization makes an interest payment on behalf of Student D after the deferment period. This payment is not excluded from Student D's income under section 108(f) and is treated as additional compensation includible in Student D's gross income. Assuming fulfillment of all other requirements of section 221, Student D may deduct this payment of interest for Federal income tax purposes.

Example 2. Payment by parent. Student E obtains a qualified education loan to attend college. Upon graduation from college, Student E makes legally required monthly payments of principal and interest. Student E's mother makes a required monthly payment of interest as a gift to Student E. A deduction for Student E as a dependent is not allowed on another taxpayer's tax return for that taxable year. Assuming fulfillment of all other requirements of section 221, Student E may deduct this payment of interest for Federal income tax purposes.

(c) Maximum deduction. The amount allowed as a deduction under section 221 for any taxable year may not exceed $2,500.

(d) Limitation based on modified adjusted gross income—

(1) In general. The deduction allowed under section 221 is phased out ratably for taxpayers with modified adjusted gross income between $50,000 and $65,000 ($100,000 and $130,000 for married individuals who file a joint return). Section 221 does not allow a deduction for taxpayers with modified adjusted gross income of $65,000 or above ($130,000 or above for married individuals who file a joint return). See paragraph (d)(3) of this section for inflation adjustment of amounts in this paragraph (d)(1).

(2) Modified adjusted gross income defined. The term modified adjusted gross income means the adjusted gross income (as defined in section 62) of the taxpayer for the taxable year increased by any amount excluded from gross income under section 911, 931, or 933 (relating to income earned abroad or from certain United States possessions or Puerto Rico). Modified adjusted gross income must be determined under this section after taking into account the inclusions, exclusions, deductions, and limitations provided by sections 86 (social security and tier 1 railroad retirement benefits), 135 (redemption of qualified United States savings bonds), 137 (adoption assistance programs), 219 (deductible qualified retirement contributions), and 469 (limitation on passive activity losses and credits), but before taking into account the

deductions provided by sections 221 and 222 (qualified tuition and related expenses).

(3) Inflation adjustment. For taxable years beginning after 2002, the amounts in paragraph (d)(1) of this section will be increased for inflation occurring after 2001 in accordance with section 221(f)(1). If any amount adjusted under section 221(f)(1) is not a multiple of $5,000, the amount will be rounded to the next lowest multiple of $5,000.

(e) Definitions—

(1) Eligible educational institution. In general, an eligible educational institution means any college, university, vocational school, or other postsecondary educational institution described in section 481 of the Higher Education Act of 1965 (20 U.S.C. 1088), as in effect on August 5, 1997, and certified by the U.S. Department of Education as eligible to participate in student aid programs administered by the Department, as described in section 25A(f)(2) and § 1.25A–2(b). For purposes of this section, an eligible educational institution also includes an institution that conducts an internship or residency program leading to a degree or certificate awarded by an institution, a hospital, or a health care facility that offers postgraduate training.

(2) Qualified higher education expenses—

(i) In general. Qualified higher education expenses means the cost of attendance (as defined in section 472 of the Higher Education Act of 1965, 20 U.S.C. 1087ll, as in effect on August 4, 1997), at an eligible educational institution, reduced by the amounts described in paragraph (e)(2)(ii) of this section. Consistent with section 472 of the Higher Education Act of 1965, a student's cost of attendance is determined by the eligible educational institution and includes tuition and fees normally assessed a student carrying the same academic workload as the student, an allowance for room and board, and an allowance for books, supplies, transportation, and miscellaneous expenses of the student.

(ii) Reductions. Qualified higher education expenses are reduced by any amount that is paid to or on behalf of a student with respect to such expenses and that is—

(A) A qualified scholarship that is excludable from income under section 117;

(B) An educational assistance allowance for a veteran or member of the armed forces under chapter 30, 31, 32, 34 or 35 of title 38, United States Code, or under chapter 1606 of title 10, United States Code;

56

(C) Employer-provided educational assistance that is excludable from income under section 127;

(D) Any other amount that is described in section 25A(g)(2)(C) (relating to amounts excludable from gross income as educational assistance);

(E) Any otherwise includible amount excluded from gross income under section 135 (relating to the redemption of United States savings bonds);

(F) Any otherwise includible amount distributed from a Coverdell education savings account and excluded from gross income under section 530(d)(2); or

(G) Any otherwise includible amount distributed from a qualified tuition program and excluded from gross income under section 529(c)(3)(B).

(3) Qualified education loan—

(i) In general. A qualified education loan means indebtedness incurred by a taxpayer solely to pay qualified higher education expenses that are—

(A) Incurred on behalf of a student who is the taxpayer, the taxpayer's spouse, or a dependent (as defined in section 152) of the taxpayer at the time the taxpayer incurs the indebtedness;

(B) Attributable to education provided during an academic period, as described in section 25A and the regulations thereunder, when the student is an eligible student as defined in section 25A(b)(3) (requiring that the student be a degree candidate carrying at least half the normal full-time workload); and

(C) Paid or incurred within a reasonable period of time before or after the taxpayer incurs the indebtedness.

(ii) Reasonable period. Except as otherwise provided in this paragraph (e)(3)(ii), what constitutes a reasonable period of time for purposes of paragraph (e)(3)(i)(C) of this section generally is determined based on all the relevant facts and circumstances. However, qualified higher education expenses are treated as paid or incurred within a reasonable period of time before or after the taxpayer incurs the indebtedness if—

(A) The expenses are paid with the proceeds of education loans that are part of a Federal postsecondary education loan program; or

58

(B) The expenses relate to a particular academic period and the loan proceeds used to pay the expenses are disbursed within a period that begins 90 days prior to the start of that academic period and ends 90 days after the end of that academic period.

(iii) Related party. A qualified education loan does not include any indebtedness owed to a person who is related to the taxpayer, within the meaning of section 267(b) or 707(b)(1). For example, a parent or grandparent of the taxpayer is a related person. In addition, a qualified education loan does not include a loan made under any qualified employer plan as defined in section 72(p)(4) or under any contract referred to in section 72(p)(5).

(iv) Federal issuance or guarantee not required. A loan does not have to be issued or guaranteed under a Federal postsecondary education loan program to be a qualified education loan.

(v) Refinanced and consolidated indebtedness—

(A) In general. A qualified education loan includes indebtedness incurred solely to refinance a qualified education loan. A qualified education loan includes a single, consolidated indebtedness

59

incurred solely to refinance two or more qualified education loans of a borrower.

(B) Treatment of refinanced and consolidated indebtedness. [Reserved]

(4) Examples. The following examples illustrate the rules of this paragraph (e):

Example 1. Eligible educational institution. University F is a postsecondary educational institution described in section 481 of the Higher Education Act of 1965. The U.S. Department of Education has certified that University F is eligible to participate in federal financial aid programs administered by that Department, although University F chooses not to participate. University F is an eligible educational institution.

Example 2. Qualified higher education expenses. Student G receives a $3,000 qualified scholarship for the 2003 fall semester that is excludable from Student G's gross income under section 117. Student G receives no other forms of financial assistance with respect to the 2003 fall semester. Student G's cost of attendance for the 2003 fall semester, as determined by Student G's eligible educational institution for purposes of calculating a student's financial need in accordance with section 472 of the Higher Education Act, is $16,000. For the 2003 fall semester, Student G has qualified higher education expenses of

60

$13,000 (the cost of attendance as determined by the institution ($16,000) reduced by the qualified scholarship proceeds excludable from gross income ($3,000)).

Example 3. Qualified education loan. Student H borrows money from a commercial bank to pay qualified higher education expenses related to his enrollment on a half-time basis in a graduate program at an eligible educational institution. Student H uses all the loan proceeds to pay qualified higher education expenses incurred within a reasonable period of time after incurring the indebtedness. The loan is not federally guaranteed. The commercial bank is not related to Student H within the meaning of section 267(b) or 707(b)(1). Student H's loan is a qualified education loan within the meaning of section 221.

Example 4. Qualified education loan. Student I signs a promissory note for a loan on August 15, 2003, to pay for qualified higher education expenses for the 2003 fall and 2004 spring semesters. On August 20, 2003, the lender disburses loan proceeds to Student I's college. The college credits them to Student I's account to pay qualified higher education expenses for the 2003 fall semester, which begins on August 25, 2003. On January 26, 2004, the lender disburses additional loan proceeds to Student I's college. The college credits them to

61

Student I's account to pay qualified higher education expenses for the 2004 spring semester, which began on January 12, 2004. Student I's qualified higher education expenses for the two semesters are paid within a reasonable period of time, as the first loan disbursement occurred within the 90 days prior to the start of the fall 2003 semester and the second loan disbursement occurred during the spring 2004 semester.

Example 5. Qualified education loan. The facts are the same as in Example 4 except that in 2005 the college is not an eligible educational institution because it loses its eligibility to participate in certain federal financial aid programs administered by the U.S. Department of Education. The qualification of Student I's loan, which was used to pay for qualified higher education expenses for the 2003 fall and 2004 spring semesters, as a qualified education loan is not affected by the college's subsequent loss of eligibility.

Example 6. Mixed-use loans. Student J signs a promissory note for a loan secured by Student J's personal residence. Student J will use part of the loan proceeds to pay for certain improvements to Student J's residence and part of the loan proceeds to pay qualified higher education expenses of Student J's spouse. Because Student J obtains the loan not solely to pay qualified higher education expenses, the loan is not a qualified education loan.

(f) Interest—

(1) In general. Amounts paid on a qualified education loan are deductible under section 221 if the amounts are interest for Federal income tax purposes. For example, interest includes—

(i) Qualified stated interest (as defined in § 1.1273–1(c)); and

(ii) Original issue discount, which generally includes capitalized interest. For purposes of section 221, capitalized interest means any accrued and unpaid interest on a qualified education loan that, in accordance with the terms of the loan, is added by the lender to the outstanding principal balance of the loan.

(2) Operative rules for original issue discount—

(i) In general. The rules to determine the amount of original issue discount on a loan and the accruals of the discount are in sections 163(e), 1271 through 1275, and the regulations thereunder. In general, original issue discount is the excess of a loan's stated redemption price at maturity (all payments due under the loan other than qualified stated interest payments) over its issue price (the amount loaned). Although original issue discount generally is deductible as it accrues under section 163(e) and § 1.163–7, original issue discount on a qualified education

63

loan is not deductible until paid. See paragraph (f)(3) of this section to determine when original issue discount is paid.

(ii) Treatment of loan origination fees by the borrower. If a loan origination fee is paid by the borrower other than for property or services provided by the lender, the fee reduces the issue price of the loan, which creates original issue discount (or additional original issue discount) on the loan in an amount equal to the fee. See § 1.1273–2(g). For an example of how a loan origination fee is taken into account, see Example 2 of paragraph (f)(4) of this section.

(3) Allocation of payments. See §§ 1.446–2(e) and 1.1275–2(a) for rules on allocating payments between interest and principal. In general, these rules treat a payment first as a payment of interest to the extent of the interest that has accrued and remains unpaid as of the date the payment is due, and second as a payment of principal. The characterization of a payment as either interest or principal under these rules applies regardless of how the parties label the payment (either as interest or principal). Accordingly, the taxpayer may deduct the portion of a payment labeled as principal that these rules treat as a payment of interest on the loan, including any portion attributable to capitalized interest or loan origination fees.

64

(4) Examples. The following examples illustrate the rules of this paragraph (f). In the examples, assume that the institution the student attends is an eligible educational institution, the loan is a qualified education loan, the student is legally obligated to make interest payments under the terms of the loan, and any other applicable requirements, if not otherwise specified, are fulfilled. The examples are as follows:

Example 1. Capitalized interest. Interest on Student K's loan accrues while Student K is in school, but Student K is not required to make any payments on the loan until six months after he graduates or otherwise leaves school. At that time, the lender capitalizes all accrued but unpaid interest and adds it to the outstanding principal amount of the loan. Thereafter, Student K is required to make monthly payments of interest and principal on the loan. The interest payable on the loan, including the capitalized interest, is original issue discount. See section 1273 and the regulations thereunder. Therefore, in determining the total amount of interest paid on the loan each taxable year, Student K may deduct any payments that § 1.1275–2(a) treats as payments of interest, including any principal payments that are treated as payments of capitalized interest. See paragraph (f)(3) of this section.

Example 2. Allocation of payments. The facts are the same as in Example 1, except that, in addition, the lender charges Student K a loan origination fee, which is not for any property or services provided by the lender. Under § 1.1273–2(g), the loan origination fee reduces the issue price of the loan, which reduction increases the amount of original issue discount on the loan by the amount of the fee. The amount of original issue discount (which includes the capitalized interest and loan origination fee) that accrues each year is determined under section 1272 and § 1.1272–1. In effect, the loan origination fee accrues over the entire term of the loan. Because the loan has original issue discount, the payment ordering rules in § 1.1275–2(a) must be used to determine how much of each payment is interest for federal tax purposes. See paragraph (f)(3) of this section. Under § 1.1275–2(a), each payment (regardless of its designation by the parties as either interest or principal) generally is treated first as a payment of original issue discount, to the extent of the original issue discount that has accrued as of the date the payment is due and has not been allocated to prior payments, and second as a payment of principal. Therefore, in determining the total amount of interest paid on the qualified education loan for a taxable year, Student K may deduct any payments that the

66

parties label as principal but that are treated as payments of original issue discount under § 1.1275–2(a).

(g) Additional Rules—

(1) Payment of interest made during period when interest payment not required. Payments of interest on a qualified education loan to which this section is applicable are deductible even if the payments are made during a period when interest payments are not required because, for example, the loan has not yet entered repayment status or is in a period of deferment or forbearance.

(2) Denial of double benefit. No deduction is allowed under this section for any amount for which a deduction is allowable under another provision of Chapter 1 of the Internal Revenue Code. No deduction is allowed under this section for any amount for which an exclusion is allowable under section 108(f) (relating to cancellation of indebtedness).

(3) Examples. The following examples illustrate the rules of this paragraph (g). In the examples, assume that the institution the student attends is an eligible educational institution, the loan is a qualified education loan, and the student is legally obligated to make interest payments under the terms of the loan:

Example 1. Voluntary payment of interest before loan has entered repayment status. Student L obtains a loan to attend college. The terms of the loan provide

that interest accrues on the loan while Student L earns his undergraduate degree but that Student L is not required to begin making payments of interest until six full calendar months after he graduates or otherwise leaves school. Nevertheless, Student L voluntarily pays interest on the loan during 2003, while enrolled in college. Assuming all other relevant requirements are met, Student L is allowed a deduction for interest paid while attending college even though the payments were made before interest payments were required.

Example 2. Voluntary payment during period of deferment or forbearance. The facts are the same as in Example 2, except that Student L makes no payments on the loan while enrolled in college. Student L graduates in June 2003 and begins making monthly payments of principal and interest on the loan in January 2004, as required by the terms of the loan. In August 2004, Student L enrolls in graduate school on a full-time basis. Under the terms of the loan, Student L may apply for deferment of the loan payments while Student L is enrolled in graduate school. Student L applies for and receives a deferment on the outstanding loan. However, Student L continues to make some monthly payments of interest during graduate school. Student L may deduct interest paid on the loan during the period beginning in January 2004, including interest paid while Student L is enrolled in graduate school.

68

(h) Effective date. This section is applicable to periods governed by section 221 as amended in 2001, which relates to interest paid on a qualified education loan after December 31, 2001, in taxable years ending after December 31, 2001, and on or before December 31, 2010.

**Federal Rule of Bankruptcy Procedure 7001**

An adversary proceeding is governed by the rules in this Part VII. The following are adversary proceedings:

(a) a proceeding to recover money or property--except a proceeding to compel the debtor to deliver property to the trustee, a proceeding by an individual debtor to recover tangible personal property under § 542(a), or a proceeding under § 554(b), § 725, Rule 2017, or Rule 6002;

(b) a proceeding to determine the validity, priority, or extent of a lien or other interest in property--except a proceeding under Rule 3012 or Rule 4003(d);

(c) a proceeding to obtain authority under § 363(h) to sell both the estate's interest in property and that of a co-owner;

(d) a proceeding to revoke or object to a discharge--except an objection under § 727(a)(8) or (a)(9), or § 1328(f);

(e) a proceeding to revoke an order confirming a plan in a Chapter 11, 12, or 13 case;

69

(f) a proceeding to determine whether a debt is dischargeable;

(g) a proceeding to obtain an injunction or other equitable relief--except when the relief is provided in a Chapter 9, 11, 12, or 13 plan;

(h) a proceeding to subordinate an allowed claim or interest--except when subordination is provided in a Chapter 9, 11, 12, or 13 plan;

(i) a proceeding to obtain a declaratory judgment related to any proceeding described in (a)-(h); and

(j) a proceeding to determine a claim or cause of action removed under 28 U.S.C. § 1452.

**Federal Rule of Appellate Procedure 4**

(a) Appeal in a Civil Case.

(1) Time for Filing a Notice of Appeal.

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

70

(i) the United States;

(ii) a United States agency;

(iii) a United States officer or employee sued in an official capacity; or

(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf– including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error coram nobis is an appeal in a civil case for purposes of Rule 4(a).

(2) Filing Before Entry of Judgment. A notice of appeal filed after the court announces a decision or order– but before the entry of the judgment or order– is treated as filed on the date of and after the entry.

(3) Multiple Appeals. If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first

71

notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) Effect of a Motion on a Notice of Appeal.

(A) If a party files in the district court any of the following motions under the Federal Rules of Civil Procedure– and does so within the time allowed by those rules– the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed within the time allowed for filing a motion under Rule 59.

(B) (i) If a party files a notice of appeal after the court announces or enters a judgment– but before it disposes of any motion listed in

72

Rule 4(a)(4)(A)– the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal– in compliance with Rule 3(c)– within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(iii) No additional fee is required to file an amended notice.

(5) Motion for Extension of Time.

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the

73

motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) Reopening the Time to File an Appeal. The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) Entry Defined.

(A) A judgment or order is entered for purposes of this Rule 4(a):

74

(i) if Federal Rule of Civil Procedure 58(a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a); or

(ii) if Federal Rule of Civil Procedure 58(a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order.

(b) Appeal in a Criminal Case.

(1) Time for Filing a Notice of Appeal.

(A) In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:

75

(i) the entry of either the judgment or the order being appealed; or

(ii) the filing of the government's notice of appeal.

(B) When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:

(i) the entry of the judgment or order being appealed; or

(ii) the filing of a notice of appeal by any defendant.

(2) Filing Before Entry of Judgment. A notice of appeal filed after the court announces a decision, sentence, or order– but before the entry of the judgment or order– is treated as filed on the date of and after the entry.

(3) Effect of a Motion on a Notice of Appeal.

(A) If a defendant timely makes any of the following motions under the Federal Rules of Criminal Procedure, the notice of appeal from a judgment of conviction must be filed within 14 days after the entry of the order disposing of the last such remaining motion, or within 14 days after the entry of the judgment of conviction, whichever period ends later. This provision applies to a timely motion:

(i) for judgment of acquittal under Rule 29;

(ii) for a new trial under Rule 33, but if based on newly discovered evidence, only if the motion is made no later than 14 days after the entry of the judgment; or

(iii) for arrest of judgment under Rule 34.

(B) A notice of appeal filed after the court announces a decision, sentence, or order– but before it disposes of any of the motions referred to in Rule 4(b)(3)(A)– becomes effective upon the later of the following:

(i) the entry of the order disposing of the last such remaining motion; or

(ii) the entry of the judgment of conviction.

(C) A valid notice of appeal is effective--without amendment--to appeal from an order disposing of any of the motions referred to in Rule 4(b)(3)(A).

(4) Motion for Extension of Time. Upon a finding of excusable neglect or good cause, the district court may– before or after the time has expired, with or without motion and notice– extend the time to file a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4(b).

77

(5) Jurisdiction. The filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a), nor does the filing of a motion under 35(a) affect the validity of a notice of appeal filed before entry of the order disposing of the motion. The filing of a motion under Federal Rule of Criminal Procedure 35(a) does not suspend the time for filing a notice of appeal from a judgment of conviction.

(6) Entry Defined. A judgment or order is entered for purposes of this Rule 4(b) when it is entered on the criminal docket.

(c) Appeal by an Inmate Confined in an Institution.

(1) If an institution has a system designed for legal mail, an inmate confined there must use that system to receive the benefit of this Rule 4(c)(1). If an inmate files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing and:

(A) it is accompanied by:

(i) a declaration in compliance with 28 U.S.C. § 1746– or a notarized statement– setting out the date of deposit and stating that first-class postage is being prepaid; or

78

(ii) evidence (such as a postmark or date stamp) showing that the notice was so deposited and that postage was prepaid; or

(B) the court of appeals exercises its discretion to permit the later filing of a declaration or notarized statement that satisfies Rule 4(c)(1)(A)(i).

(2) If an inmate files the first notice of appeal in a civil case under this Rule 4(c), the 14-day period provided in Rule 4(a)(3) for another party to file a notice of appeal runs from the date when the district court dockets the first notice.

(3) When a defendant in a criminal case files a notice of appeal under this Rule 4(c), the 30-day period for the government to file its notice of appeal runs from the entry of the judgment or order appealed from or from the district court's docketing of the defendant's notice of appeal, whichever is later.

(d) Mistaken Filing in the Court of Appeals. If a notice of appeal in either a civil or a criminal case is mistakenly filed in the court of appeals, the clerk of that court must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted.

**Federal Rule of Appellate Procedure 6**

(a) Appeal From a Judgment, Order, or Decree of a District Court Exercising Original Jurisdiction in a Bankruptcy Case or Proceeding. An appeal to a court of appeals from a final judgment, order, or decree of a district court exercising original jurisdiction in a bankruptcy case or proceeding under 28 U.S.C. § 1334 is taken as any other civil appeal under these rules. But the reference in Rule 4(a)(4)(A) to the time allowed for motions under certain Federal Rules of Civil Procedure must be read as a reference to the time allowed for the equivalent motions under the applicable Federal Rules of Bankruptcy Procedure, which may be shorter than the time allowed under the Civil Rules.

(b) Appeal From a Judgment, Order, or Decree of a District Court or Bankruptcy Appellate Panel Exercising Appellate Jurisdiction in a Bankruptcy Case or Proceeding.

(1) Applicability of Other Rules. These rules apply to an appeal to a court of appeals under 28 U.S.C. § 158(d)(1) from a final judgment, order, or decree of a district court or bankruptcy appellate panel exercising appellate jurisdiction in a bankruptcy case or proceeding under 28 U.S.C. § 158(a) or (b), but with these qualifications:

80

(A) Rules 4(a)(4), 4(b), 9, 10, 11, 12(c), 13-20, 22-23, and 24(b) do not apply;

(B) the reference in Rule 3(c) to "Forms 1A and 1B in the Appendix of Forms" must be read as a reference to Form 5;

(C) when the appeal is from a bankruptcy appellate panel, "district court," as used in any applicable rule, means "bankruptcy appellate panel"; and

(D) in Rule 12.1, "district court" includes a bankruptcy court or bankruptcy appellate panel.

(2) Additional Rules. In addition to the rules made applicable by Rule 6(b)(1), the following rules apply:

(A) Motion for Rehearing.

(i) If a timely motion for rehearing under Bankruptcy Rule 8022 is filed, the time to appeal for all parties runs from the entry of the order disposing of the motion. A notice of appeal filed after the district court or bankruptcy appellate panel announces or enters a judgment, order, or decree– but before disposition of the motion for rehearing– becomes effective when the order disposing of the motion for rehearing is entered.

81

(ii) If a party intends to challenge the order disposing of the motion– or the alteration or amendment of a judgment, order, or decree upon the motion– then the party, in accordance with Rules 3(c) and 6(b)(1)(B), must file a notice of appeal or amended notice of appeal. The notice or amended notice must be filed within the time prescribed by Rule 4– excluding Rules 4(a)(4) and 4(b)– measured from the entry of the order disposing of the motion.

(iii) No additional fee is required to file an amended notice.

(B) The Record on Appeal.

(i) Within 14 days after filing the notice of appeal, the appellant must file with the clerk possessing the record assembled in accordance with Bankruptcy Rule 8009– and serve on the appellee– a statement of the issues to be presented on appeal and a designation of the record to be certified and made available to the circuit clerk.

(ii) An appellee who believes that other parts of the record are necessary must, within 14 days after being served with the appellant's designation, file with the clerk and serve on the appellant a designation of additional parts to be included.

82

(iii) The record on appeal consists of:

- the redesignated record as provided above;

- the proceedings in the district court or bankruptcy appellate panel; and

- a certified copy of the docket entries prepared by the clerk under Rule 3(d).

(C) Making the Record Available.

(i) When the record is complete, the district clerk or bankruptcy-appellate-panel clerk must number the documents constituting the record and promptly make it available to the circuit clerk. If the clerk makes the record available in paper form, the clerk will not send documents of unusual bulk or weight, physical exhibits other than documents, or other parts of the record designated for omission by local rule of the court of appeals, unless directed to do so by a party or the circuit clerk. If unusually bulky or heavy exhibits are to be made available in paper form, a party must arrange with the clerks in advance for their transportation and receipt.

83

(ii) All parties must do whatever else is necessary to enable the clerk to assemble the record and make it available. When the record is made available in paper form, the court of appeals may provide by rule or order that a certified copy of the docket entries be made available in place of the redesignated record. But at any time during the appeal's pendency, any party may request that the redesignated record be made available.

(D) Filing the Record. When the district clerk or bankruptcy-appellate-panel clerk has made the record available, the circuit clerk must note that fact on the docket. The date as noted serves as the filing date of the record. The circuit clerk must immediately notify all parties of that date.

(c) Direct Appeal from a Judgment, Order, or Decree of a Bankruptcy Court by Authorization Under 28 U.S.C. § 158(d)(2).

(1) Applicability of Other Rules. These rules apply to a direct appeal from a judgment, order, or decree of a bankruptcy court by authorization under 28 U.S.C. § 158(d)(2), but with these qualifications:

(A) Rules 3-4, 5 (except as provided in this Rule 6(c)), 6(a), 6(b), 8(a), 8(c), 9-12, 13-20, 22-23, and 24(b) do not apply; and

84

(B) as used in any applicable rule, "district court" or "district clerk" includes– to the extent appropriate– a bankruptcy court or bankruptcy appellate panel or its clerk.

(2) Additional Rules. In addition to the rules made applicable by Rule 6(c)(1), the following rules apply:

(A) Petition to Authorize a Direct Appeal. Within 30 days after a certification of a bankruptcy court's order for direct appeal to the court of appeals under 28 U.S.C. § 158(d)(2) becomes effective under Bankruptcy Rule 8006(a), any party to the appeal may ask the court of appeals to authorize a direct appeal by filing a petition with the circuit clerk under Bankruptcy Rule 8006(g).

(B) Contents of the Petition. The petition must include the material required by Rule 5(b)(1) and an attached copy of:

(i) the certification; and

(ii) the notice of appeal of the bankruptcy court's judgment, order, or decree filed under Bankruptcy Rule 8003 or 8004.

(C) Answer or Cross-Petition; Oral Argument. Rule 5(b)(2) governs an answer or cross-petition. Rule 5(b)(3) governs oral argument.

85

(D) Form of Papers; Number of Copies; Length Limits. Rule 5(c) governs the required form, number of copies to be filed, and length limits applicable to the petition and any answer or cross-petition.

(E) Notice of Appeal; Calculating Time. A notice of appeal to the court of appeals need not be filed. The date when the order authorizing the direct appeal is entered serves as the date of the notice of appeal for calculating time under these rules.

(F) Notification of the Order Authorizing Direct Appeal; Fees; Docketing the Appeal.

> (i) When the court of appeals enters the order authorizing the direct appeal, the circuit clerk must notify the bankruptcy clerk and the district court clerk or bankruptcy-appellate-panel clerk of the entry.

> (ii) Within 14 days after the order authorizing the direct appeal is entered, the appellant must pay the bankruptcy clerk any unpaid required fee, including:

> > • the fee required for the appeal to the district court or bankruptcy appellate panel; and

86

> > • the difference between the fee for an appeal to the district court or bankruptcy appellate panel and the fee required for an appeal to the court of appeals.
>
> (iii) The bankruptcy clerk must notify the circuit clerk once the appellant has paid all required fees. Upon receiving the notice, the circuit clerk must enter the direct appeal on the docket.

(G) Stay Pending Appeal. Bankruptcy Rule 8007 governs any stay pending appeal.

(H) The Record on Appeal. Bankruptcy Rule 8009 governs the record on appeal. If a party has already filed a document or completed a step required to assemble the record for the appeal to the district court or bankruptcy appellate panel, the party need not repeat that filing or step.

(I) Making the Record Available. Bankruptcy Rule 8010 governs completing the record and making it available. When the court of appeals enters the order authorizing the direct appeal, the bankruptcy clerk must make the record available to the circuit clerk.

(J) Duties of the Circuit Clerk. When the bankruptcy clerk has made the record available, the circuit clerk must note that fact on the docket. The date as noted

87

serves as the filing date of the record. The circuit clerk must immediately notify all parties of that date.

(K) Filing a Representation Statement. Unless the court of appeals designates another time, within 14 days after the order authorizing the direct appeal is entered, the attorney for each party to the appeal must file a statement with the circuit clerk naming the parties that the attorney represents on appeal.

**11 U.S.C. § 109**

(a) Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title.

(b) A person may be a debtor under chapter 7 of this title only if such person is not–

(1) a railroad;

(2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, a New Markets Venture Capital company as defined in section 351 of the Small Business Investment Act of 1958, a small business investment company licensed by the Small Business Administration under section 301 of the Small Business Investment Act of 1958, credit union, or industrial bank or

88

similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act, except that an uninsured State member bank, or a corporation organized under section 25A of the Federal Reserve Act, which operates, or operates as, a multilateral clearing organization pursuant to section 4091 of the Federal Deposit Insurance Corporation Improvement Act of 1991 may be a debtor if a petition is filed at the direction of the Board of Governors of the Federal Reserve System; or

(3)    (A) a foreign insurance company, engaged in such business in the United States; or

(B) a foreign bank, savings bank, cooperative bank, savings and loan association, building and loan association, or credit union, that has a branch or agency (as defined in section 1(b) of the International Banking Act of 1978) in the United States.

(c) An entity may be a debtor under chapter 9 of this title if and only if such entity–

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

89

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5)    (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

(d) Only a railroad, a person that may be a debtor under chapter 7 of this title (except a stockbroker or a commodity broker), and an uninsured State member bank, or a corporation organized under section 25A of the Federal Reserve Act, which operates, or operates as, a multilateral clearing organization pursuant to section 4091 of the Federal Deposit Insurance Corporation Improvement Act of 1991 may be a debtor under chapter 11 of this title.

90

(e) Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $526,700 [originally "$250,000", adjusted effective April, 1, 2025]2 and noncontingent, liquidated, secured debts of less than $1,580,125 [originally "$750,000", adjusted effective April 1, 2025],2 or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $526,700 [originally "$250,000", adjusted effective April, 1, 2025]2 and noncontingent, liquidated, secured debts of less than $1,580,125 [originally "$750,000", adjusted effective April 1, 2025]2 may be a debtor under chapter 13 of this title.

(f) Only a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title.

(g) Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if--

> (1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case; or

91

(2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.

(h)  (1) Subject to paragraphs (2) and (3), and notwithstanding any other provision of this section other than paragraph (4) of this subsection, an individual may not be a debtor under this title unless such individual has, during the 180-day period ending on the date of filing of the petition by such individual, received from an approved nonprofit budget and credit counseling agency described in section 111(a) an individual or group briefing (including a briefing conducted by telephone or on the Internet) that outlined the opportunities for available credit counseling and assisted such individual in performing a related budget analysis.

(2)  (A) Paragraph (1) shall not apply with respect to a debtor who resides in a district for which the United States trustee (or the bankruptcy administrator, if any) determines that the approved nonprofit budget and credit counseling agencies for such district are not reasonably able to provide adequate services to the additional individuals who would otherwise seek credit counseling from such agencies by reason of the requirements of paragraph (1).

92

(B) The United States trustee (or the bankruptcy administrator, if any) who makes a determination described in subparagraph (A) shall review such determination not later than 1 year after the date of such determination, and not less frequently than annually thereafter. Notwithstanding the preceding sentence, a nonprofit budget and credit counseling agency may be disapproved by the United States trustee (or the bankruptcy administrator, if any) at any time.

(3) (A) Subject to subparagraph (B), the requirements of paragraph (1) shall not apply with respect to a debtor who submits to the court a certification that–

(i) describes exigent circumstances that merit a waiver of the requirements of paragraph (1);

(ii) states that the debtor requested credit counseling services from an approved nonprofit budget and credit counseling agency, but was unable to obtain the services referred to in paragraph (1) during the 7-day period beginning on the date on which the debtor made that request; and

(iii) is satisfactory to the court.

(B) With respect to a debtor, an exemption under subparagraph (A) shall cease to apply to that debtor on the date on which the debtor meets the requirements of paragraph (1), but in no case may the exemption apply to that debtor after the date that is 30 days after the debtor files a petition, except that the court, for cause, may order an additional 15 days.

(4) The requirements of paragraph (1) shall not apply with respect to a debtor whom the court determines, after notice and hearing, is unable to complete those requirements because of incapacity, disability, or active military duty in a military combat zone. For the purposes of this paragraph, incapacity means that the debtor is impaired by reason of mental illness or mental deficiency so that he is incapable of realizing and making rational decisions with respect to his financial responsibilities; and "disability" means that the debtor is so physically impaired as to be unable, after reasonable effort, to participate in an in person, telephone, or Internet briefing required under paragraph (1).

**11 U.S.C. § 523**

(a) A discharge under section 727, 1141, 11921 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

(1) for a tax or a customs duty–

(A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed;

(B) with respect to which a return, or equivalent report or notice, if required–

(i) was not filed or given; or

(ii) was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing–

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

95

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

(C) (i) for purposes of subparagraph (A)–

(I) consumer debts owed to a single creditor and aggregating more than $900 [originally "$500", adjusted effective April 1, 2025]2 for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief under this title are presumed to be nondischargeable; and

(II) cash advances aggregating more than $1,250 [originally "$750", adjusted effective April 1, 2025]2 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before the order for relief under this title, are presumed to be nondischargeable; and

(ii) for purposes of this subparagraph–

(I) the terms "consumer", "credit", and "open end credit plan" have the same meanings as in section 103 of the Truth in Lending Act; and

(II) the term "luxury goods or services" does not include goods or services reasonably necessary for the support or maintenance of the debtor or a dependent of the debtor;

(3) neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit–

(A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

(B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

97

(5) for a domestic support obligation;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

(7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty–

    (A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or

    (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition;

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for--

    (A)   (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

       (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

(9) for death or personal injury caused by the debtor's operation of a motor vehicle, vessel, or aircraft if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance;

(10) that was or could have been listed or scheduled by the debtor in a prior case concerning the debtor under this title or under the Bankruptcy Act in which the debtor waived discharge, or was denied a discharge under section 727(a)(2), (3), (4), (5), (6), or (7) of this title, or under section 14c(1), (2), (3), (4), (6), or (7) of such Act;

(11) provided in any final judgment, unreviewable order, or consent order or decree entered in any court of the United States or of any State, issued by a Federal depository institutions regulatory agency, or contained in any settlement agreement entered into by the debtor, arising from any act of fraud or defalcation while acting in a fiduciary capacity committed with respect to any depository institution or insured credit union;

(12) for malicious or reckless failure to fulfill any commitment by the debtor to a Federal depository institutions regulatory agency to maintain the capital of

99

an insured depository institution, except that this paragraph shall not extend any such commitment which would otherwise be terminated due to any act of such agency;

(13) for any payment of an order of restitution issued under title 18, United States Code;

(14) incurred to pay a tax to the United States that would be nondischargeable pursuant to paragraph (1);

(14A) incurred to pay a tax to a governmental unit, other than the United States, that would be nondischargeable under paragraph (1);

(14B) incurred to pay fines or penalties imposed under Federal election law;

(15) to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit;

(16) for a fee or assessment that becomes due and payable after the order for relief to a membership association with respect to the debtor's interest in a unit that has condominium ownership, in a share of a cooperative corporation, or a lot in a homeowners association, for as long as the debtor or the trustee has a

100

legal, equitable, or possessory ownership interest in such unit, such corporation, or such lot, but nothing in this paragraph shall except from discharge the debt of a debtor for a membership association fee or assessment for a period arising before entry of the order for relief in a pending or subsequent bankruptcy case;

(17) for a fee imposed on a prisoner by any court for the filing of a case, motion, complaint, or appeal, or for other costs and expenses assessed with respect to such filing, regardless of an assertion of poverty by the debtor under subsection (b) or (f)(2) of section 1915 of title 28 (or a similar non-Federal law), or the debtor's status as a prisoner, as defined in section 1915(h) of title 28 (or a similar non-Federal law);

(18) owed to a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, under–

    (A) a loan permitted under section 408(b)(1) of the Employee Retirement Income Security Act of 1974, or subject to section 72(p) of the Internal Revenue Code of 1986; or

    (B) a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

(19) that–

(A) is for–

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from–

(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii) any settlement agreement entered into by the debtor; or

102

(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor; or

(20) for injury to an individual by the debtor relating to a violation of chapter 77 of title 18, including injury caused by an instance in which the debtor knowingly benefitted financially, or by receiving anything of value, from participation in a venture that the debtor knew or should have known engaged in an act in violation of chapter 77 of title 18.

For purposes of this subsection, the term "return" means a return that satisfies the requirements of applicable nonbankruptcy law (including applicable filing requirements). Such term includes a return prepared pursuant to section 6020(a) of the Internal Revenue Code of 1986, or similar State or local law, or a written stipulation to a judgment or a final order entered by a nonbankruptcy tribunal, but does not include a return made pursuant to section 6020(b) of the Internal Revenue Code of 1986, or a similar State or local law.

(b) Notwithstanding subsection (a) of this section, a debt that was excepted from discharge under subsection (a)(1), (a)(3), or (a)(8) of this section, under section 17a(1), 17a(3), or 17a(5) of the Bankruptcy Act, under section 439A of the Higher Education Act of 1965, or under section 733(g) of the Public Health Service Act in a

103

prior case concerning the debtor under this title, or under the Bankruptcy Act, is dischargeable in a case under this title unless, by the terms of subsection (a) of this section, such debt is not dischargeable in the case under this title.

(c)    (1) Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

(2) Paragraph (1) shall not apply in the case of a Federal depository institutions regulatory agency seeking, in its capacity as conservator, receiver, or liquidating agent for an insured depository institution, to recover a debt described in subsection (a)(2), (a)(4), (a)(6), or (a)(11) owed to such institution by an institution-affiliated party unless the receiver, conservator, or liquidating agent was appointed in time to reasonably comply, or for a Federal depository institutions regulatory agency acting in its corporate capacity as a successor to such receiver, conservator, or liquidating agent to reasonably comply, with subsection (a)(3)(B) as a creditor of such institution-affiliated party with respect to such debt.

104

(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

(e) Any institution-affiliated party of an insured depository institution shall be considered to be acting in a fiduciary capacity with respect to the purposes of subsection (a)(4) or (11).

**20 U.S.C. § 1087ll**

(a) In general

For the purpose of this subchapter, the term "cost of attendance" means–

(1) tuition and fees normally assessed a student carrying the same academic workload as determined by the institution;

(2) an allowance for books, course materials, supplies, and equipment, which shall include all such costs required of all such students in the same course of study, including a reasonable allowance for the documented rental or upfront purchase of a personal computer, as determined by the institution;

105

(3) an allowance for transportation, which may include transportation between campus, residences, and place of work, as determined by the institution;

(4) an allowance for miscellaneous personal expenses, for a student attending the institution on at least a half-time basis, as determined by the institution;

(5) an allowance for living expenses, including food and housing costs, to be incurred by the student attending the institution on at least a half-time basis, as determined by the institution, which shall include--

    (A) for a student electing institutionally owned or operated food services, such as board or meal plans, a standard allowance for such services that provides the equivalent of three meals each day;

    (B) for a student not electing institutionally owned or operated food services, such as board or meal plans, a standard allowance for purchasing food off campus that provides the equivalent of three meals each day;

    (C) for a student without dependents residing in institutionally owned or operated housing, a standard allowance determined by the institution based on the average or median amount assessed to such residents for housing charges, whichever is greater;

106

(D) for a student with dependents residing in institutionally owned or operated housing, a standard allowance determined by the institution based on the average or median amount assessed to such residents for housing charges, whichever is greater;

(E) for a student living off campus, and not in institutionally owned or operated housing, a standard allowance for rent or other housing costs;

(F) for a dependent student residing at home with parents, a standard allowance that shall not be zero determined by the institution;

(G) for a student living in housing located on a military base or for which a basic allowance is provided under section 403(b) Title 37, a standard allowance for food based upon such student's choice of purchasing food on-campus or off-campus (determined respectively in accordance with subparagraph (A) or (B)), but not for housing costs; and

(H) for all other students, an allowance based on the expenses reasonably incurred by such students for housing and food;

(6) for a student engaged in a program of study by correspondence, only tuition and fees and, if required, books and supplies, travel, and housing and food costs incurred specifically in fulfilling a required period of residential training;

107

(7) for a confined or incarcerated student, only tuition, fees, books, course materials, supplies, equipment, and the cost of obtaining a license, certification, or a first professional credential in accordance with paragraph (14);

(8) for a student enrolled in an academic program in a program of study abroad approved for credit by the student's home institution, reasonable costs associated with such study (as determined by the institution at which such student is enrolled);

(9) for a student with one or more dependents, an allowance based on the estimated actual expenses incurred for such dependent care, based on the number and age of such dependents, except that--

> (A) such allowance shall not exceed the reasonable cost in the community in which such student resides for the kind of care provided; and

> (B) the period for which dependent care is required includes, but is not limited to, class-time, study-time, field work, internships, and commuting time;

(10) for a student with a disability, an allowance (as determined by the institution) for those expenses related to the student's disability, including

special services, personal assistance, transportation, equipment, and supplies that are reasonably incurred and not provided for by other assisting agencies;

(11) for a student receiving all or part of the student's instruction by means of telecommunications technology, no distinction shall be made with respect to the mode of instruction in determining costs;

(12) for a student engaged in a work experience under a cooperative education program, an allowance for reasonable costs associated with such employment (as determined by the institution);

(13) for a student who receives a Federal student loan made under this subchapter or any other Federal law, to cover a student's cost of attendance at the institution, an allowance for the actual cost of any loan fee, origination fee, or insurance premium charged to such student or the parent of such student on such loan, or the average cost of any such fee or premium, as applicable; and

(14) for a student in a program requiring professional licensure, certification, or a first professional credential, the cost of obtaining the license, certification, or a first professional credential.

(b) Special rule for living expenses for less-than-half-time students

For students attending an institution of higher education less than half-time, an institution of higher education may include an allowance for living expenses,

109

including food and housing costs in accordance with subsection (a)(4) for up to three semesters, or the equivalent, with no more than two semesters being consecutive.

(c) Disclosure of cost of attendance elements

Each institution shall make publicly available on the institution's website a list of all the elements of cost of attendance described in paragraphs (1) through (14) of subsection (a), and shall disclose such elements on any portion of the website describing tuition and fees of the institution.

**20 U.S.C. § 1088**

(a) Academic and award year

(1) For the purpose of any program under this subchapter, the term "award year" shall be defined as the period beginning July 1 and ending June 30 of the following year.

(2) (A) For the purpose of any program under this subchapter, the term "academic year" shall–

(i) require a minimum of 30 weeks of instructional time for a course of study that measures its program length in credit hours; or

110

(ii) require a minimum of 26 weeks of instructional time for a course of study that measures its program length in clock hours; and

(iii) require an undergraduate course of study to contain an amount of instructional time whereby a full-time student is expected to complete at least--

(I) 24 semester or trimester hours or 36 quarter credit hours in a course of study that measures its program length in credit hours; or

(II) 900 clock hours in a course of study that measures its program length in clock hours.

(B) The Secretary may reduce such minimum of 30 weeks to not less than 26 weeks for good cause, as determined by the Secretary on a case-by-case basis, in the case of an institution of higher education that provides a 2-year or 4-year program of instruction for which the institution awards an associate or baccalaureate degree and that measures program length in credit hours or clock hours.

(b) Eligible program

111

(1) For purposes of this subchapter, the term "eligible program" means a program of at least–

> (A) 600 clock hours of instruction, 16 semester hours, or 24 quarter hours, offered during a minimum of 15 weeks, in the case of a program that–

>> (i) provides a program of training to prepare students for gainful employment in a recognized profession; and

>> (ii) admits students who have not completed the equivalent of an associate degree; or

> (B) 300 clock hours of instruction, 8 semester hours, or 12 hours, offered during a minimum of 10 weeks, in the case of--

>> (i) an undergraduate program that requires the equivalent of an associate degree for admissions; or

>> (ii) a graduate or professional program.

(2)   (A) A program is an eligible program for purposes of part B of this subchapter if it is a program of at least 300 clock hours of instruction, but less than 600 clock hours of instruction, offered during a minimum of 10 weeks, that–

(i) has a verified completion rate of at least 70 percent, as determined in accordance with the regulations of the Secretary;

(ii) has a verified placement rate of at least 70 percent, as determined in accordance with the regulations of the Secretary; and

(iii) satisfies such further criteria as the Secretary may prescribe by regulation.

(B) In the case of a program being determined eligible for the first time under this paragraph, such determination shall be made by the Secretary before such program is considered to have satisfied the requirements of this paragraph.

(3) An otherwise eligible program that is offered in whole or in part through telecommunications is eligible for the purposes of this subchapter if the program is offered by an institution, other than a foreign institution, that has been evaluated and determined (before or after February 8, 2006) to have the capability to effectively deliver distance education programs by an accrediting agency or association that–

(A) is recognized by the Secretary under subpart 2 of part H; and

113

(B) has evaluation of distance education programs within the scope of its recognition, as described in section 1099b(n)(3) of this title.

(4) For purposes of this subchapter, the term "eligible program" includes an instructional program that, in lieu of credit hours or clock hours as the measure of student learning, utilizes direct assessment of student learning, or recognizes the direct assessment of student learning by others, if such assessment is consistent with the accreditation of the institution or program utilizing the results of the assessment. In the case of a program being determined eligible for the first time under this paragraph, such determination shall be made by the Secretary before such program is considered to be an eligible program.

(c) Third party servicer

For purposes of this subchapter, the term "third party servicer" means any individual, any State, or any private, for-profit or nonprofit organization, which enters into a contract with–

(1) any eligible institution of higher education to administer, through either manual or automated processing, any aspect of such institution's student assistance programs under this subchapter; or

(2) any guaranty agency, or any eligible lender, to administer, through either manual or automated processing, any aspect of such guaranty agency's or

114

lender's student loan programs under part B of this subchapter, including originating, guaranteeing, monitoring, processing, servicing, or collecting loans.

(d) Definitions for military deferments

For purposes of parts B, D, and E of this subchapter:

(1) Active duty

The term "active duty" has the meaning given such term in section 101(d)(1) of Title 10, except that such term does not include active duty for training or attendance at a service school.

(2) Military operation

The term "military operation" means a contingency operation as such term is defined in section 101(a)(13) of Title 10.

(3) National emergency

The term "national emergency" means the national emergency by reason of certain terrorist attacks declared by the President on September 14, 2001, or subsequent national emergencies declared by the President by reason of terrorist attacks.

(4) Serving on active duty

115

The term "serving on active duty during a war or other military operation or national emergency" means service by an individual who is–

(A) a Reserve of an Armed Force ordered to active duty under section 12301(a), 12301(g), 12302, 12304, or 12306 of Title 10 or any retired member of an Armed Force ordered to active duty under section 688 of such title, for service in connection with a war or other military operation or national emergency, regardless of the location at which such active duty service is performed; and

(B) any other member of an Armed Force on active duty in connection with such emergency or subsequent actions or conditions who has been assigned to a duty station at a location other than the location at which such member is normally assigned.

(5) Qualifying National Guard duty

The term "qualifying National Guard duty during a war or other military operation or national emergency" means service as a member of the National Guard on full-time National Guard duty (as defined in section 101(d)(5) of Title 10) under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under section 502(f)

116

of Title 32 in connection with a war, other military operation, or a national emergency declared by the President and supported by Federal funds.

(e) Consumer reporting agency

For purposes of this subchapter, the term "consumer reporting agency" has the meaning given the term "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis" in Section1 1681a(p) of Title 15.

(f) Definition of educational service agency

For purposes of parts B, D, and E, the term "educational service agency" has the meaning given the term in section 7801 of this title.

**20 U.S.C. § 1091**

(a) In general

In order to receive any grant, loan, or work assistance under this subchapter, a student must–

> (1) be enrolled or accepted for enrollment in a degree, certificate, or other program (including a program of study abroad approved for credit by the eligible institution at which such student is enrolled) leading to a recognized educational credential at an institution of higher education that is an eligible institution in accordance with the provisions of section 1094 of this title, except

117

as provided in subsections (b)(3) and (b)(4), and not be enrolled in an elementary or secondary school;

(2) if the student is presently enrolled at an institution, be maintaining satisfactory progress in the course of study the student is pursuing in accordance with the provisions of subsection (c);

(3) not owe a refund on grants previously received at any institution under this subchapter, or be in default on any loan from a student loan fund at any institution provided for in part E, or a loan made, insured, or guaranteed by the Secretary under this subchapter for attendance at any institution;

(4) file with the Secretary, as part of the original financial aid application process, a certification, which need not be notarized, but which shall include–

    (A) a statement of educational purpose stating that the money attributable to such grant, loan, or loan guarantee will be used solely for expenses related to attendance or continued attendance at such institution; and

    (B) such student's social security number;

(5) be a citizen or national of the United States, a permanent resident of the United States, or able to provide evidence from the Immigration and Naturalization Service that he or she is in the United States for other than a

temporary purpose with the intention of becoming a citizen or permanent resident; and

(6) if the student has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining funds under this subchapter, have completed the repayment of such funds to the Secretary, or to the holder in the case of a loan under this subchapter obtained by fraud.

(b) Eligibility for student loans

(1) In order to be eligible to receive any loan under this subchapter (other than a loan under section 1078-2 or 1078-3 of this title, or under section 1078-8 of this title pursuant to an exercise of discretion under section 1087tt of this title) for any period of enrollment, a student who is not a graduate or professional student (as defined in regulations of the Secretary), and who is enrolled in a program at an institution which has a participation agreement with the Secretary to make awards under subpart 1 of part A of this subchapter, shall–

    (A)   (i) have received a determination of eligibility or ineligibility for a Pell Grant under such subpart 1 for such period of enrollment; and

            (ii) if determined to be eligible, have filed an application for a Pell Grant for such enrollment period; or

119

(B) have

    (i) filed an application with the Pell Grant processor for such institution for such enrollment period, and

    (ii) received from the financial aid administrator of the institution a preliminary determination of the student's eligibility or ineligibility for a grant under such subpart 1.

(2) In order to be eligible to receive any loan under section 1078-11 of this title for any period of enrollment, a student shall–

    (A) have received a determination of need for a loan under section 1078(a)(2)(B) of this title;

    (B) if determined to have need for a loan under section 1078 of this title, have applied for such a loan; and

    (C) has applied for a loan under section 1078-8 of this title, if such student is eligible to apply for such a loan.

(3) A student who–

    (A) is carrying at least one-half the normal full-time work load for the course of study that the student is pursuing, as determined by an eligible institution, and

(B) is enrolled in a course of study necessary for enrollment in a program leading to a degree or certificate,

shall be, notwithstanding paragraph (1) of subsection (a), eligible to apply for loans under part B or D of this subchapter. The eligibility described in this paragraph shall be restricted to one 12-month period.

(4) A student who–

(A) is carrying at least one-half the normal full-time work load for the course of study the student is pursuing, as determined by the institution, and

(B) is enrolled or accepted for enrollment in a program at an eligible institution necessary for a professional credential or certification from a State that is required for employment as a teacher in an elementary or secondary school in that State,

shall be, notwithstanding paragraph (1) of subsection (a), eligible to apply for loans under part B, D, or E or work-study assistance under part C of this subchapter.

(5) Notwithstanding any other provision of this subsection, no incarcerated student is eligible to receive a loan under this subchapter.

(c) Satisfactory progress

(1) For the purpose of subsection (a)(2), a student is maintaining satisfactory progress if–

    (A) the institution at which the student is in attendance, reviews the progress of the student at the end of each academic year, or its equivalent, as determined by the institution, and

    (B) the student has a cumulative C average, or its equivalent or academic standing consistent with the requirements for graduation, as determined by the institution, at the end of the second such academic year.

(2) Whenever a student fails to meet the eligibility requirements of subsection (a)(2) as a result of the application of this subsection and subsequent to that failure the student has academic standing consistent with the requirements for graduation, as determined by the institution, for any grading period, the student may, subject to this subsection, again be eligible under subsection (a)(2) for a grant, loan, or work assistance under this subchapter.

(3) Any institution of higher education at which the student is in attendance may waive the provisions of paragraph (1) or paragraph (2) of this subsection for undue hardship based on--

    (A) the death of a relative of the student,

    (B) the personal injury or illness of the student, or

122

(C) special circumstances as determined by the institution.

(d) Students who are not high school graduates

(1) Student eligibility

In order for a student who does not have a certificate of graduation from a school providing secondary education, or the recognized equivalent of such certificate, to be eligible for any assistance under subparts 1, 3, and 4 of part A and parts B, C, D, and E of this subchapter, the student shall meet the requirements of one of the following subparagraphs:

(A) The student is enrolled in an eligible career pathway program and meets one of the following standards:

(i) The student shall take an independently administered examination and shall achieve a score, specified by the Secretary, demonstrating that such student can benefit from the education or training being offered. Such examination shall be approved by the Secretary on the basis of compliance with such standards for development, administration, and scoring as the Secretary may prescribe in regulations.

(ii) The student shall be determined as having the ability to benefit from the education or training in accordance with such process as

123

the State shall prescribe. Any such process described or approved by a State for the purposes of this section shall be effective 6 months after the date of submission to the Secretary unless the Secretary disapproves such process. In determining whether to approve or disapprove such process, the Secretary shall take into account the effectiveness of such process in enabling students without secondary school diplomas or the equivalent thereof to benefit from the instruction offered by institutions utilizing such process, and shall also take into account the cultural diversity, economic circumstances, and educational preparation of the populations served by the institutions.

(iii) The student shall be determined by the institution of higher education as having the ability to benefit from the education or training offered by the institution of higher education upon satisfactory completion of 6 credit hours or the equivalent coursework that are applicable toward a degree or certificate offered by the institution of higher education.

(B) The student has completed a secondary school education in a home school setting that is treated as a home school or private school under State law.

(2) Eligible career pathway program

In this subsection, the term "eligible career pathway program" means a program that combines rigorous and high-quality education, training, and other services that–

(A) aligns with the skill needs of industries in the economy of the State or regional economy involved;

(B) prepares an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the "National Apprenticeship Act"; 50 Stat. 664, chapter 663; 29 U.S.C. 50 et seq.) (referred to individually in this chapter as an "apprenticeship", except in section 171);2

(C) includes counseling to support an individual in achieving the individual's education and career goals;

(D) includes, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;

(E) organizes education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;

(F) enables an individual to attain a secondary school diploma or its recognized equivalent, and at least 1 recognized postsecondary credential; and

(G) helps an individual enter or advance within a specific occupation or occupational cluster.

(e) Certification for GSL eligibility

Each eligible institution may certify student eligibility for a loan by an eligible lender under part B of this subchapter prior to completing the review for accuracy of the information submitted by the applicant required by regulations issued under this subchapter, if–

(1) checks for the loans are mailed to the eligible institution prior to disbursements;

126

(2) the disbursement is not made until the review is complete; and

(3) the eligible institution has no evidence or documentation on which the institution may base a determination that the information submitted by the applicant is incorrect.

(f) Loss of eligibility for violation of loan limits

(1) No student shall be eligible to receive any grant, loan, or work assistance under this subchapter if the eligible institution determines that the student fraudulently borrowed in violation of the annual loan limits under part B, part D, or part E of this subchapter in the same academic year, or if the student fraudulently borrowed in excess of the aggregate maximum loan limits under such part B, part D, or part E.

(2) If the institution determines that the student inadvertently borrowed amounts in excess of such annual or aggregate maximum loan limits, such institution shall allow the student to repay any amount borrowed in excess of such limits prior to certifying the student's eligibility for further assistance under this subchapter.

(g) Verification of immigration status

(1) In general

127

The Secretary shall implement a system under which the statements and supporting documentation, if required, of an individual declaring that such individual is in compliance with the requirements of subsection (a)(5) shall be verified prior to the individual's receipt of a grant, loan, or work assistance under this subchapter.

(2) Special rule

The documents collected and maintained by an eligible institution in the admission of a student to the institution may be used by the student in lieu of the documents used to establish both employment authorization and identity under section 1324a(b)(1)(B) of Title 8 to verify eligibility to participate in work-study programs under part C of this subchapter.

(3) Verification mechanisms

The Secretary is authorized to verify such statements and supporting documentation through a data match, using an automated or other system, with other Federal agencies that may be in possession of information relevant to such statements and supporting documentation.

(4) Review

In the case of such an individual who is not a citizen or national of the United States, if the statement described in paragraph (1) is submitted but the

128

documentation required under paragraph (2) is not presented or if the documentation required under paragraph (2)(A) is presented but such documentation is not verified under paragraph (3)–

(A) the institution–

(i) shall provide a reasonable opportunity to submit to the institution evidence indicating a satisfactory immigration status, and

(ii) may not delay, deny, reduce, or terminate the individual's eligibility for the grant, loan, or work assistance on the basis of the individual's immigration status until such a reasonable opportunity has been provided; and

(B) if there are submitted documents which the institution determines constitute reasonable evidence indicating such status--

(i) the institution shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,

129

(ii) pending such verification, the institution may not delay, deny, reduce, or terminate the individual's eligibility for the grant, loan, or work assistance on the basis of the individual's immigration status, and

(iii) the institution shall not be liable for the consequences of any action, delay, or failure of the Service to conduct such verification.

(h) Limitations of enforcement actions against institutions

The Secretary shall not take any compliance, disallowance, penalty, or other regulatory action against an institution of higher education with respect to any error in the institution's determination to make a student eligible for a grant, loan, or work assistance based on citizenship or immigration status--

(1) if the institution has provided such eligibility based on a verification of satisfactory immigration status by the Immigration and Naturalization Service,

(2) because the institution, under subsection (g)(4)(A)(i), was required to provide a reasonable opportunity to submit documentation, or

(3) because the institution, under subsection (g)(4)(B)(i), was required to wait for the response of the Immigration and Naturalization Service to the

130

institution's request for official verification of the immigration status of the student.

(i) Validity of loan guarantees for loan payments made before immigration status verification completed

Notwithstanding subsection (h), if–

(1) a guaranty is made under this subchapter for a loan made with respect to an individual,

(2) at the time the guaranty is entered into, the provisions of subsection (h) had been complied with,

(3) amounts are paid under the loan subject to such guaranty, and

(4) there is a subsequent determination that, because of an unsatisfactory immigration status, the individual is not eligible for the loan,

the official of the institution making the determination shall notify and instruct the entity making the loan to cease further payments under the loan, but such guaranty shall not be voided or otherwise nullified with respect to such payments made before the date the entity receives the notice.

(j) Repealed. Pub.L. 110-315, Title IV, § 485(a)(4), Aug. 14, 2008, 122 Stat. 3288

(k) Special rule for correspondence courses

A student shall not be eligible to receive grant, loan, or work assistance under this subchapter for a correspondence course unless such course is part of a program leading to an associate, bachelor or graduate degree.

(l) Courses offered through distance education

(1) Relation to correspondence courses

(A) In general

A student enrolled in a course of instruction at an institution of higher education that is offered principally through distance education and leads to a recognized certificate, or recognized associate, recognized baccalaureate, or recognized graduate degree, conferred by such institution, shall not be considered to be enrolled in correspondence courses.

(B) Exception

An institution of higher education referred to in subparagraph (A) shall not include an institution or school described in section 2302(3)(C) of this title.

(2) Reductions of financial aid

132

A student's eligibility to receive grants, loans, or work assistance under this subchapter shall be reduced if a financial aid officer determines under the discretionary authority provided in section 1087tt of this title that distance education results in a substantially reduced cost of attendance to such student.

(3) Special rule

For award years beginning prior to July 1, 2008, the Secretary shall not take any compliance, disallowance, penalty, or other action based on a violation of this subsection against a student or an eligible institution when such action arises out of such institution's prior award of student assistance under this subchapter if the institution demonstrates to the satisfaction of the Secretary that its course of instruction would have been in conformance with the requirements of this subsection.

(m) Students with a first baccalaureate or professional degree

A student shall not be ineligible for assistance under parts B, C, D, and E of this subchapter because such student has previously received a baccalaureate or professional degree.

(n) Study abroad

Nothing in this chapter shall be construed to limit or otherwise prohibit access to study abroad programs approved by the home institution at which a student is enrolled. An

otherwise eligible student who is engaged in a program of study abroad approved for academic credit by the home institution at which the student is enrolled shall be eligible to receive grant, loan, or work assistance under this subchapter, without regard to whether such study abroad program is required as part of the student's degree program.

(o) Verification of social security number

The Secretary of Education, in cooperation with the Commissioner of the Social Security Administration, shall verify any social security number provided by a student to an eligible institution under subsection (a)(4) and shall enforce the following conditions:

(1) Except as provided in paragraphs (2) and (3), an institution shall not deny, reduce, delay, or terminate a student's eligibility for assistance under this part because social security number verification is pending.

(2) If there is a determination by the Secretary that the social security number provided to an eligible institution by a student is incorrect, the institution shall deny or terminate the student's eligibility for any grant, loan, or work assistance under this subchapter until such time as the student provides documented evidence of a social security number that is determined by the institution to be correct.

134

(3) If there is a determination by the Secretary that the social security number provided to an eligible institution by a student is incorrect, and a correct social security number cannot be provided by such student, and a loan has been guaranteed for such student under part B of this subchapter, the institution shall notify and instruct the lender and guaranty agency making and guaranteeing the loan, respectively, to cease further disbursements of the loan, but such guaranty shall not be voided or otherwise nullified with respect to such disbursements made before the date that the lender and the guaranty agency receives such notice.

(4) Nothing in this subsection shall permit the Secretary to take any compliance, disallowance, penalty, or other regulatory action against--

    (A) any institution of higher education with respect to any error in a social security number, unless such error was a result of fraud on the part of the institution; or

    (B) any student with respect to any error in a social security number, unless such error was a result of fraud on the part of the student.

(p) Use of income data with IRS

135

The Secretary, in cooperation with the Secretary of the Treasury, shall fulfill the data transfer requirements under section 6103(l)(13) of Title 26 and the procedure and requirements outlined in section 1098h of this title.

(q) Students with intellectual disabilities

(1) Definitions

In this subsection the terms "comprehensive transition and postsecondary program for students with intellectual disabilities" and "student with an intellectual disability" have the meanings given the terms in section 1140 of this title.

(2) Requirements

Notwithstanding subsections (a), (c), and (d), in order to receive any grant or work assistance under section 1070a of this title, subpart 3 of part A, or part C, a student with an intellectual disability shall--

(A) be enrolled or accepted for enrollment in a comprehensive transition and postsecondary program for students with intellectual disabilities at an institution of higher education;

(B) be maintaining satisfactory progress in the program as determined by the institution, in accordance with standards established by the institution; and

136

(C) meet the requirements of paragraphs (3), (4), (5), and (6) of subsection (a).

(3) Authority

Notwithstanding any other provision of law unless such provision is enacted with specific reference to this section, the Secretary is authorized to waive any statutory provision applicable to the student financial assistance programs under section 1070a of this title, subpart 3 of part A, or part C (other than a provision of part F related to such a program), or any institutional eligibility provisions of this subchapter, as the Secretary determines necessary to ensure that programs enrolling students with intellectual disabilities otherwise determined to be eligible under this subsection may receive such financial assistance.

(4) Regulations

Notwithstanding regulations applicable to grant or work assistance awards made under section 1070a of this title, subpart 3 of part A, and part C (other than a regulation under part F related to such an award), including with respect to eligible programs, instructional time, credit status, and enrollment status as described in section 1088 of this title, the Secretary shall promulgate regulations allowing programs enrolling students with intellectual disabilities

137

otherwise determined to be eligible under this subsection to receive such awards.

(r) Data analysis on access to Federal student aid for certain populations

(1) Development of the system

Within one year of August 14, 2008, the Secretary shall analyze data from the FAFSA containing information regarding the number, characteristics, and circumstances of students denied Federal student aid based on a drug conviction while receiving Federal aid.

(2) Results from analysis

The results from the analysis of such information shall be made available on a continuous basis via the Department website and the Digest of Education Statistics.

(3) Data updating

The data analyzed under this subsection shall be updated at the beginning of each award year and at least one additional time during such award year.

(4) Report to Congress

The Secretary shall prepare and submit to the authorizing committees, in each fiscal year, a report describing the results obtained by the establishment and operation of the data system authorized by this subsection.

138

(s) Exception to required registration with the Selective Service System

Notwithstanding section 3811(f) of Title 50, an individual shall not be ineligible for assistance or a benefit provided under this subchapter if the individual is required under section 3802 of Title 50 to present himself for and submit to registration under such section and fails to do so in accordance with any proclamation issued under such section, or in accordance with any rule or regulation issued under such section.

(t) Confined or incarcerated individuals

(1) Definitions

In this subsection:

(A) Confined or incarcerated individual

The term "confined or incarcerated individual"–

(i) means an individual who is serving a criminal sentence in a Federal, State, or local penal institution, prison, jail, reformatory, work farm, or other similar correctional institution; and

(ii) does not include an individual who is in a halfway house or home detention or is sentenced to serve only weekends.

(B) Prison education program

The term "prison education program" means an education or training program that–

139

(i) is an eligible program under this subchapter offered by an institution of higher education (as defined in section 1001 or 1002(a)(1)(B) of this title);

(ii) is offered by an institution that has been approved to operate in a correctional facility by the appropriate State department of corrections or other entity that is responsible for overseeing correctional facilities, or by the Bureau of Prisons;

(iii) has been determined by the appropriate State department of corrections or other entity that is responsible for overseeing correctional facilities, or by the Bureau of Prisons, to be operating in the best interest of students, the determination of which shall be made by the State department of corrections or other entity or by the Bureau of Prisons, respectively, and may be based on–

(I) rates of confined or incarcerated individuals continuing their education post-release;

(II) job placement rates for such individuals;

(III) earnings for such individuals;

(IV) rates of recidivism for such individuals;

140

(V) the experience, credentials, and rates of turnover or departure of instructors;

(VI) the transferability of credits for courses available to confined or incarcerated individuals and the applicability of such credits toward related degree or certificate programs; or

(VII) offering relevant academic and career advising services to participating confined or incarcerated individuals while they are confined or incarcerated, in advance of reentry, and upon release;

(iv) offers transferability of credits to at least 1 institution of higher education (as defined in section 1001 or 1002(a)(1)(B) of this title) in the State in which the correctional facility is located, or, in the case of a Federal correctional facility, in the State in which most of the individuals confined or incarcerated in such facility will reside upon release;

(v) is offered by an institution that has not been subject, during the 5 years preceding the date of the determination, to–

141

(I) any suspension, emergency action, or termination of programs under this subchapter;

(II) any adverse action by the institution's accrediting agency or association; or

(III) any action by the State to revoke a license or other authority to operate;

(vi) satisfies any applicable educational requirements for professional licensure or certification, including licensure or certification examinations needed to practice or find employment in the sectors or occupations for which the program prepares the individual, in the State in which the correctional facility is located or, in the case of a Federal correctional facility, in the State in which most of the individuals confined or incarcerated in such facility will reside upon release; and

(vii) does not offer education that is designed to lead to licensure or employment for a specific job or occupation in the State if such job or occupation typically involves prohibitions on the licensure or employment of formerly incarcerated individuals in the State in which the correctional facility is located, or, in the case of a Federal

142

correctional facility, in the State in which most of the individuals confined or incarcerated in such facility will reside upon release.

(2) Technical assistance

The Secretary, in collaboration with the Attorney General, shall provide technical assistance and guidance to the Bureau of Prisons, State departments of corrections, and other entities that are responsible for overseeing correctional facilities in making determinations under paragraph (1)(B)(iii).

(3) Federal Pell Grant eligibility

Notwithstanding subsection (a), in order for a confined or incarcerated individual who otherwise meets the eligibility requirements of this subchapter to be eligible to receive a Federal Pell Grant under section 1070a of this title, the individual shall be enrolled or accepted for enrollment in a prison education program.

(4) Evaluation

(A) In general

Not later than 1 year after December 27, 2020, in order to evaluate and improve the impact of activities supported under this subsection, the Secretary, in partnership with the Director of the Institute of Education Sciences, shall award 1 or more grants or contracts to, or enter into

143

cooperative agreements with, experienced public and private institutions and organizations to enable the institutions and organizations to conduct an external evaluation that shall--

(i) assess the ability of confined or incarcerated individuals to access and complete the Free Application for Federal Student Aid;

(ii) examine in-custody outcomes and post-release outcomes related to providing Federal Pell Grants to confined or incarcerated individuals, including--

(I) attainment of a postsecondary degree or credential;

(II) safety in penal institutions with prison education programs;

(III) the size of waiting lists for prison education programs;

(IV) the extent to which such individuals continue their education post-release;

(V) employment and earnings outcomes for such individuals; and

(VI) rates of recidivism for such individuals;

144

(iii) track individuals who received Federal Pell Grants under subpart 1 of part A at 1, 3, and 5 years after the individuals' release from confinement or incarceration; and

(iv) examine the extent to which institutions provide re-entry or relevant career services to participating confined or incarcerated individuals as part of the prison education program and the efficacy of such services, if offered.

(B) Report

Beginning not later than 1 year after the Secretary awards the grant, contract, or cooperative agreement described in subparagraph (A) and annually thereafter, each institution of higher education operating a prison education program under this subsection shall submit a report to the Secretary on activities assisted and students served under this subsection, which shall include the information, as applicable, contained in clauses (i) through (iv) of subparagraph (A).

(5) Report

Not later than 1 year after December 27, 2020, and on at least an annual basis thereafter, the Secretary shall submit to the authorizing committees, and make publicly available on the website of the Department, a report on the–

145

(A) impact of this subsection which shall include, at a minimum--

(i) the names and types of institutions of higher education offering prison education programs at which confined or incarcerated individuals are enrolled and receiving Federal Pell Grants;

(ii) the number of confined or incarcerated individuals receiving Federal Pell Grants through each prison education program;

(iii) the amount of Federal Pell Grant expenditures for each prison education program;

(iv) the average amount of Federal Pell Grant expenditures per full-time equivalent students in a prison education program compared to the average amount of Federal Pell Grant expenditures per full-time equivalent students not in prison education programs;

(v) the demographics of confined or incarcerated individuals receiving Federal Pell Grants;

(vi) the cost of attendance for such individuals;

(vii) the mode of instruction (such as distance education, in-person instruction, or a combination of such modes) for each prison education program;

146

(viii) information on the academic outcomes of such individuals (such as credits attempted and earned, and credential and degree completion) and any information available from student satisfaction surveys conducted by the applicable institution or correctional facility;

(ix) information on post-release outcomes of such individuals, including, to the extent practicable, continued postsecondary enrollment, earnings, credit transfer, and job placement;

(x) rates of recidivism for confined or incarcerated individuals receiving Federal Pell Grants;

(xi) information on transfers of confined or incarcerated individuals between prison education programs;

(xii) the most common programs and courses offered in prison education programs; and

(xiii) rates of instructor turnover or departure for courses offered in prison education programs;

(B) results of each prison education program at each institution of higher education, including the information described in clauses (ii) through (xiii) of subparagraph (A); and

147

(C) findings regarding best practices with respect to prison education programs.

## 26 U.S.C. § 25A

(a) Allowance of credit.– In the case of an individual, there shall be allowed as a credit against the tax imposed by this chapter for the taxable year the amount equal to the sum of–

(1) the American Opportunity Tax Credit, plus

(2) the Lifetime Learning Credit.

(b) American Opportunity Tax Credit.–

(1) Per student credit.– In the case of any eligible student for whom an election is in effect under this section for any taxable year, the American Opportunity Tax Credit is an amount equal to the sum of–

(A) 100 percent of so much of the qualified tuition and related expenses paid by the taxpayer during the taxable year (for education furnished to the eligible student during any academic period beginning in such taxable year) as does not exceed $2,000, plus

(B) 25 percent of such expenses so paid as exceeds $2,000 but does not exceed $4,000.

(2) Limitations applicable to American Opportunity Tax Credit.–

(A) Credit allowed only for 4 taxable years.– An election to have this section apply with respect to any eligible student for purposes of the American Opportunity Tax Credit under subsection (a)(1) may not be made for any taxable year if such an election (by the taxpayer or any other individual) is in effect with respect to such student for any 4 prior taxable years.

(B) Credit allowed for year only if individual is at least ½ time student for portion of year.– The American Opportunity Tax Credit under subsection (a)(1) shall not be allowed for a taxable year with respect to the qualified tuition and related expenses of an individual unless such individual is an eligible student for at least one academic period which begins during such year.

(C) Credit allowed only for first 4 years of postsecondary education.– The American Opportunity Tax Credit under subsection (a)(1) shall not be allowed for a taxable year with respect to the qualified tuition and related expenses of an eligible student if the student has completed (before the beginning of such taxable year) the first 4 years of postsecondary education at an eligible educational institution.

149

(D) Denial of credit if student convicted of a felony drug offense.– The American Opportunity Tax Credit under subsection (a)(1) shall not be allowed for qualified tuition and related expenses for the enrollment or attendance of a student for any academic period if such student has been convicted of a Federal or State felony offense consisting of the possession or distribution of a controlled substance before the end of the taxable year with or within which such period ends.

(3) Eligible student.– For purposes of this subsection, the term "eligible student" means, with respect to any academic period, a student who–

(A) meets the requirements of section 484(a)(1) of the Higher Education Act of 1965 (20 U.S.C. 1091(a)(1)), as in effect on the date of the enactment of this section, and

(B) is carrying at least ½ the normal full-time work load for the course of study the student is pursuing.

(4) Restrictions on taxpayers who improperly claimed American Opportunity Tax Credit in prior years.–

(A) Taxpayers making prior fraudulent or reckless claims.–

(i) In general.– No American Opportunity Tax Credit shall be allowed under this section for any taxable year in the disallowance period.

(ii) Disallowance period.– For purposes of subparagraph (A), the disallowance period is–

(I) the period of 10 taxable years after the most recent taxable year for which there was a final determination that the taxpayer's claim of the American Opportunity Tax Credit under this section was due to fraud, and

(II) the period of 2 taxable years after the most recent taxable year for which there was a final determination that the taxpayer's claim of the American Opportunity Tax Credit under this section was due to reckless or intentional disregard of rules and regulations (but not due to fraud).

(B) Taxpayers making improper prior claims.– In the case of a taxpayer who is denied the American Opportunity Tax Credit under this section for any taxable year as a result of the deficiency procedures under subchapter B of chapter 63, no American Opportunity Tax Credit shall be allowed under this section for any subsequent taxable year unless the

151

taxpayer provides such information as the Secretary may require to demonstrate eligibility for such credit.

(c) Lifetime Learning Credit.–

(1) Per taxpayer credit.– The Lifetime Learning Credit for any taxpayer for any taxable year is an amount equal to 20 percent of so much of the qualified tuition and related expenses paid by the taxpayer during the taxable year (for education furnished during any academic period beginning in such taxable year) as does not exceed $10,000.

(2) Special rules for determining expenses.–

(A) Coordination with American Opportunity Tax Credit.– The qualified tuition and related expenses with respect to an individual who is an eligible student for whom a1 American Opportunity Tax Credit under subsection (a)(1) is allowed for the taxable year shall not be taken into account under this subsection.

(B) Expenses eligible for Lifetime Learning Credit.– For purposes of paragraph (1), qualified tuition and related expenses shall include expenses described in subsection (f)(1) with respect to any course of instruction at an eligible educational institution to acquire or improve job skills of the individual.

(d) Limitations based on modified adjusted gross income.–

(1) In general.– The American Opportunity Tax Credit and the Lifetime Learning Credit shall each (determined without regard to this paragraph) be reduced (but not below zero) by the amount which bears the same ratio to each such credit (as so determined) as–

(A) the excess of–

(i) the taxpayer's modified adjusted gross income for such taxable year, over

(ii) $80,000 ($160,000 in the case of a joint return), bears to

(B) $10,000 ($20,000 in the case of a joint return).

(2) Modified adjusted gross income.– For purposes of this subsection, the term "modified adjusted gross income" means the adjusted gross income of the taxpayer for the taxable year increased by any amount excluded from gross income under section 911, 931, or 933.

(e) Election not to have section apply.– A taxpayer may elect not to have this section apply with respect to the qualified tuition and related expenses of an individual for any taxable year.

(f) Definitions.– For purposes of this section–

(1) Qualified tuition and related expenses.–

153

(A) In general.– The term "qualified tuition and related expenses" means tuition and fees required for the enrollment or attendance of–

(i) the taxpayer,

(ii) the taxpayer's spouse, or

(iii) any dependent of the taxpayer with respect to whom the taxpayer is allowed a deduction under section 151,

at an eligible educational institution for courses of instruction of such individual at such institution.

(B) Exception for education involving sports, etc.– Such term does not include expenses with respect to any course or other education involving sports, games, or hobbies, unless such course or other education is part of the individual's degree program.

(C) Exception for nonacademic fees.– Such term does not include student activity fees, athletic fees, insurance expenses, or other expenses unrelated to an individual's academic course of instruction.

(D) Required course materials taken into account for American Opportunity Tax Credit.– For purposes of determining the American Opportunity Tax Credit, subparagraph (A) shall be applied by substituting "tuition, fees, and course materials" for "tuition and fees".

154

(2) Eligible educational institution.--The term "eligible educational institution" means an institution–

    (A) which is described in section 481 of the Higher Education Act of 1965 (20 U.S.C. 1088), as in effect on the date of the enactment of this section, and

    (B) which is eligible to participate in a program under title IV of such Act.

(g) Special rules.–

    (1) Identification requirement.–

        (A) Social security number requirement.– No credit shall be allowed under subsection (a) to an individual unless the individual includes on the return of tax for the taxable year–

            (i) such individual's social security number, and

            (ii) in the case of a credit with respect to the qualified tuition and related expenses of an individual other than the taxpayer or the taxpayer's spouse, the name and social security number of such individual.

        (B) Institution.– No American Opportunity Tax Credit shall be allowed under this section unless the taxpayer includes the employer

identification number of any institution to which the taxpayer paid qualified tuition and related expenses taken into account under this section on the return of tax for the taxable year.

(C) Social security number defined.– For purposes of this paragraph, the term "social security number" shall have the meaning given such term in section 24(h)(7).

(2) Adjustment for certain scholarships, etc.– The amount of qualified tuition and related expenses otherwise taken into account under subsection (a) with respect to an individual for an academic period shall be reduced (before the application of subsections (b), (c), and (d)) by the sum of any amounts paid for the benefit of such individual which are allocable to such period as–

(A) a qualified scholarship which is excludable from gross income under section 117,

(B) an educational assistance allowance under chapter 30, 31, 32, 34, or 35 of title 38, United States Code, or under chapter 1606 of title 10, United States Code, and

(C) a payment (other than a gift, bequest, devise, or inheritance within the meaning of section 102(a)) for such individual's educational expenses, or attributable to such individual's enrollment at an eligible

156

educational institution, which is excludable from gross income under any law of the United States.

(3) Treatment of expenses paid by dependent.--If a deduction under section 151 with respect to an individual is allowed to another taxpayer for a taxable year beginning in the calendar year in which such individual's taxable year begins–

(A) no credit shall be allowed under subsection (a) to such individual for such individual's taxable year,

(B) qualified tuition and related expenses paid by such individual during such individual's taxable year shall be treated for purposes of this section as paid by such other taxpayer, and

(C) a statement described in paragraph (8) and received by such individual shall be treated as received by the taxpayer.

(4) Treatment of certain prepayments.– If qualified tuition and related expenses are paid by the taxpayer during a taxable year for an academic period which begins during the first 3 months following such taxable year, such academic period shall be treated for purposes of this section as beginning during such taxable year.

(5) Denial of double benefit.– No credit shall be allowed under this section for any expense for which a deduction is allowed under any other provision of this chapter.

(6) No credit for married individuals filing separate returns.– If the taxpayer is a married individual (within the meaning of section 7703), this section shall apply only if the taxpayer and the taxpayer's spouse file a joint return for the taxable year.

(7) Nonresident aliens.– If the taxpayer is a nonresident alien individual for any portion of the taxable year, this section shall apply only if such individual is treated as a resident alien of the United States for purposes of this chapter by reason of an election under subsection (g) or (h) of section 6013.

(8) Payee statement requirement.– Except as otherwise provided by the Secretary, no credit shall be allowed under this section unless the taxpayer receives a statement furnished under section 6050S(d) which contains all of the information required by paragraph (2) thereof.

[(h) Repealed. Pub.L. 116-260, Div. EE, Title I, § 104(a)(2), Dec. 27, 2020, 134 Stat. 3041]

(i) Portion of American Opportunity Tax Credit made refundable.– Forty percent of so much of the credit allowed under subsection (a) as is attributable to the American

Opportunity Tax Credit (determined after application of subsection (d) and without regard to this paragraph2 and section 26(a)) shall be treated as a credit allowable under subpart C (and not allowed under subsection (a)). The preceding sentence shall not apply to any taxpayer for any taxable year if such taxpayer is a child to whom subsection (g) of section 1 applies for such taxable year.

(j) Regulations.– The Secretary may prescribe such regulations as may be necessary or appropriate to carry out this section, including regulations providing for a recapture of the credit allowed under this section in cases where there is a refund in a subsequent taxable year of any amount which was taken into account in determining the amount of such credit.

## 26 U.S.C. § 221

(a) Allowance of deduction.– In the case of an individual, there shall be allowed as a deduction for the taxable year an amount equal to the interest paid by the taxpayer during the taxable year on any qualified education loan.

(b) Maximum deduction.–

(1) In general.– Except as provided in paragraph (2), the deduction allowed by subsection (a) for the taxable year shall not exceed $2,500.

(2) Limitation based on modified adjusted gross income.–

159

(A) In general.– The amount which would (but for this paragraph) be allowable as a deduction under this section shall be reduced (but not below zero) by the amount determined under subparagraph (B).

(B) Amount of reduction.– The amount determined under this subparagraph is the amount which bears the same ratio to the amount which would be so taken into account as–

    (i) the excess of–

        (I) the taxpayer's modified adjusted gross income for such taxable year, over

        (II) $50,000 ($100,000 in the case of a joint return), bears to

    (ii) $15,000 ($30,000 in the case of a joint return).

(C) Modified adjusted gross income.– The term "modified adjusted gross income" means adjusted gross income determined–

    (i) without regard to this section and sections 85(c)1 911, 931, and 933, and

    (ii) after application of sections 86, 135, 137, 219, and 469.

(c) Dependents not eligible for deduction.– No deduction shall be allowed by this section to an individual for the taxable year if a deduction under section 151 with

160

respect to such individual is allowed to another taxpayer for the taxable year beginning in the calendar year in which such individual's taxable year begins.

(d) Definitions.– For purposes of this section–

(1) Qualified education loan.– The term "qualified education loan" means any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses–

(A) which are incurred on behalf of the taxpayer, the taxpayer's spouse, or any dependent of the taxpayer as of the time the indebtedness was incurred,

(B) which are paid or incurred within a reasonable period of time before or after the indebtedness is incurred, and

(C) which are attributable to education furnished during a period during which the recipient was an eligible student.

Such term includes indebtedness used to refinance indebtedness which qualifies as a qualified education loan. The term "qualified education loan" shall not include any indebtedness owed to a person who is related (within the meaning of section 267(b) or 707(b)(1)) to the taxpayer or to any person by reason of a loan under any qualified employer plan (as

161

defined in section 72(p)(4)) or under any contract referred to in section 72(p)(5).

(2) Qualified higher education expenses.– The term "qualified higher education expenses" means the cost of attendance (as defined in section 472 of the Higher Education Act of 1965, 20 U.S.C. 1087ll, as in effect on the day before the date of the enactment of the Taxpayer Relief Act of 1997) at an eligible educational institution, reduced by the sum of–

(A) the amount excluded from gross income under section 127, 135, 529, or 530 by reason of such expenses, and

(B) the amount of any scholarship, allowance, or payment described in section 25A(g)(2).

For purposes of the preceding sentence, the term "eligible educational institution" has the same meaning given such term by section 25A(f)(2), except that such term shall also include an institution conducting an internship or residency program leading to a degree or certificate awarded by an institution of higher education, a hospital, or a health care facility which offers postgraduate training.

(3) Eligible student.– The term "eligible student" has the meaning given such term by section 25A(b)(3).

162

(4) Dependent.– The term "dependent" has the meaning given such term by section 152 (determined without regard to subsections (b)(1), (b)(2), and (d)(1)(B) thereof).

(e) Special rules.–

(1) Denial of double benefit.– No deduction shall be allowed under this section for any amount for which a deduction is allowable under any other provision of this chapter, or for which an exclusion is allowable under section 127 to the taxpayer by reason of the payment by the taxpayer's employer of any indebtedness on a qualified education loan of the taxpayer. The deduction otherwise allowable under subsection (a) (prior to the application of subsection (b)) to the taxpayer for any taxable year shall be reduced (but not below zero) by so much of the distributions treated as a qualified higher education expense under section 529(c)(9) with respect to loans of the taxpayer as would be includible in gross income under section 529(c)(3)(A) for such taxable year but for such treatment.

(2) Married couples must file joint return.– If the taxpayer is married at the close of the taxable year, the deduction shall be allowed under subsection (a) only if the taxpayer and the taxpayer's spouse file a joint return for the taxable year.

(3) Marital status.– Marital status shall be determined in accordance with section 7703.

(f) Inflation adjustments.–

(1) In general.– In the case of a taxable year beginning after 2002, the $50,000 and $100,000 amounts in subsection (b)(2) shall each be increased by an amount equal to–

(A) such dollar amount, multiplied by

(B) the cost-of-living adjustment determined under section 1(f)(3) for the calendar year in which the taxable year begins, determined by substituting "calendar year 2001" for "calendar year 2016" in subparagraph (A)(ii) thereof.

(2) Rounding.– If any amount as adjusted under paragraph (1) is not a multiple of $5,000, such amount shall be rounded to the next lowest multiple of $5,000.

## 26 U.S.C. § 267

(a) Partner not acting in capacity as partner.–

(1) In general.– If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall,

164

except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner.

(2) Treatment of payments to partners for property or services.– Except as provided by the Secretary–

    (A) Treatment of certain services and transfers of property.– If–

        (i) a partner performs services for a partnership or transfers property to a partnership,

        (ii) there is a related direct or indirect allocation and distribution to such partner, and

        (iii) the performance of such services (or such transfer) and the allocation and distribution, when viewed together, are properly characterized as a transaction occurring between the partnership and a partner acting other than in his capacity as a member of the partnership,

        such allocation and distribution shall be treated as a transaction described in paragraph (1).

    (B) Treatment of certain property transfers.– If–

        (i) there is a direct or indirect transfer of money or other property by a partner to a partnership,

165

(ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and

(iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property,

such transfers shall be treated either as a transaction described in paragraph (1) or as a transaction between 2 or more partners acting other than in their capacity as members of the partnership.

(b) Certain sales or exchanges of property with respect to controlled partnerships.–

(1) Losses disallowed.– No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between–

(A) a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or the profits interest, in such partnership, or

(B) two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests.

166

In the case of a subsequent sale or exchange by a transferee described in this paragraph, section 267(d) shall be applicable as if the loss were disallowed under section 267(a)(1). For purposes of section 267(a)(2), partnerships described in subparagraph (B) of this paragraph shall be treated as persons specified in section 267(b).

(2) Gains treated as ordinary income.– In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221–

(A) between a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or profits interest, in such partnership, or

(B) between two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests,

any gain recognized shall be considered as ordinary income.

(3) Ownership of a capital or profits interest.--For purposes of paragraphs (1) and (2) of this subsection, the ownership of a capital or profits interest in a partnership shall be determined in accordance with the rules for constructive

167

ownership of stock provided in section 267(c) other than paragraph (3) of such section.

(c) Guaranteed payments.– To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).

**26 U.S.C. § 707**

(a) Partner not acting in capacity as partner.–

(1) In general.– If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner.

(2) Treatment of payments to partners for property or services.– Except as provided by the Secretary–

(A) Treatment of certain services and transfers of property.– If–

(i) a partner performs services for a partnership or transfers property to a partnership,

168

(ii) there is a related direct or indirect allocation and distribution to such partner, and

(iii) the performance of such services (or such transfer) and the allocation and distribution, when viewed together, are properly characterized as a transaction occurring between the partnership and a partner acting other than in his capacity as a member of the partnership,

such allocation and distribution shall be treated as a transaction described in paragraph (1).

(B) Treatment of certain property transfers.– If–

(i) there is a direct or indirect transfer of money or other property by a partner to a partnership,

(ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and

(iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property,

169

such transfers shall be treated either as a transaction described in paragraph (1) or as a transaction between 2 or more partners acting other than in their capacity as members of the partnership.

(b) Certain sales or exchanges of property with respect to controlled partnerships.–

(1) Losses disallowed.– No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between--

(A) a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or the profits interest, in such partnership, or

(B) two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests.

In the case of a subsequent sale or exchange by a transferee described in this paragraph, section 267(d) shall be applicable as if the loss were disallowed under section 267(a)(1). For purposes of section 267(a)(2), partnerships described in subparagraph (B) of this paragraph shall be treated as persons specified in section 267(b).

(2) Gains treated as ordinary income.– In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221–

(A) between a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or profits interest, in such partnership, or

(B) between two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests,

any gain recognized shall be considered as ordinary income.

(3) Ownership of a capital or profits interest.– For purposes of paragraphs (1) and (2) of this subsection, the ownership of a capital or profits interest in a partnership shall be determined in accordance with the rules for constructive ownership of stock provided in section 267(c) other than paragraph (3) of such section.

(c) Guaranteed payments.– To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the

171

purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).

**28 U.S.C. § 157**

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b) (1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to–

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

172

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

173

(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

(3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

(4) Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2).

(5) The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

(c) (1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and

174

conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

(e) If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

**28 U.S.C. § 158**

(a) The district courts of the United States shall have jurisdiction to hear appeals1

    (1) from final judgments, orders, and decrees;

    (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

    (3) with leave of the court, from other interlocutory orders and decrees;

    of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

(b)   (1) The judicial council of a circuit shall establish a bankruptcy appellate panel service composed of bankruptcy judges of the districts in the circuit who are appointed by the judicial council in accordance with paragraph (3), to hear and determine, with the consent of all the parties, appeals under subsection (a) unless the judicial council finds that–

    (A) there are insufficient judicial resources available in the circuit; or

    (B) establishment of such service would result in undue delay or increased cost to parties in cases under title 11.

Not later than 90 days after making the finding, the judicial council shall submit to the Judicial Conference of the United States a report containing the factual basis of such finding.

(2)  (A) A judicial council may reconsider, at any time, the finding described in paragraph (1).

(B) On the request of a majority of the district judges in a circuit for which a bankruptcy appellate panel service is established under paragraph (1), made after the expiration of the 1-year period beginning on the date such service is established, the judicial council of the circuit shall determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

(C) On its own motion, after the expiration of the 3-year period beginning on the date a bankruptcy appellate panel service is established under paragraph (1), the judicial council of the circuit may determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

(D) If the judicial council finds that either of such circumstances exists, the judicial council may provide for the completion of the appeals then pending before such service and the orderly termination of such service.

(3) Bankruptcy judges appointed under paragraph (1) shall be appointed and may be reappointed under such paragraph.

(4) If authorized by the Judicial Conference of the United States, the judicial councils of 2 or more circuits may establish a joint bankruptcy appellate panel comprised of bankruptcy judges from the districts within the circuits for which such panel is established, to hear and determine, upon the consent of all the parties, appeals under subsection (a) of this section.

(5) An appeal to be heard under this subsection shall be heard by a panel of 3 members of the bankruptcy appellate panel service, except that a member of such service may not hear an appeal originating in the district for which such member is appointed or designated under section 152 of this title.

(6) Appeals may not be heard under this subsection by a panel of the bankruptcy appellate panel service unless the district judges for the district in which the appeals occur, by majority vote, have authorized such service to hear and determine appeals originating in such district.

(c)    (1) Subject to subsections (b) and (d)(2), each appeal under subsection (a) shall be heard by a 3-judge panel of the bankruptcy appellate panel service established under subsection (b)(1) unless–

    (A) the appellant elects at the time of filing the appeal; or

178

(B) any other party elects, not later than 30 days after service of notice of the appeal;

to have such appeal heard by the district court.

(2) An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

(d) (1) The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.

(2) (A) The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that–

(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for

179

the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

(B) If the bankruptcy court, the district court, or the bankruptcy appellate panel–

(i) on its own motion or on the request of a party, determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists; or

(ii) receives a request made by a majority of the appellants and a majority of appellees (if any) to make the certification described in subparagraph (A);

180

then the bankruptcy court, the district court, or the bankruptcy appellate panel shall make the certification described in subparagraph (A).

(C) The parties may supplement the certification with a short statement of the basis for the certification.

(D) An appeal under this paragraph does not stay any proceeding of the bankruptcy court, the district court, or the bankruptcy appellate panel from which the appeal is taken, unless the respective bankruptcy court, district court, or bankruptcy appellate panel, or the court of appeals in which the appeal is pending, issues a stay of such proceeding pending the appeal.

(E) Any request under subparagraph (B) for certification shall be made not later than 60 days after the entry of the judgment, order, or decree.

**28 U.S.C. § 1334**

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts,

181

the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

(c)    (1) Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

(d) Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the

applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

(e) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction–

(1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

(2) over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.